JACK FROST SALES, INC., Plaintiff-Appellee, *v.* HARRIS TRUST AND SAVINGS BANK, Trustee, *et al.*, Defendants-Appellants.

First District (4th Division)    No. 81-13

Opinion filed January 28, 1982.—Rehearing denied April 26, 1982.

Sapoznick, Sheridan & Freidin, of Chicago (Robert P. Sheridan, of counsel), for appellants.

Boodell, Sears, Sugrue, Giambalvo & Crowley, of Chicago (James L. Donnelly, Jr., and Greg A. Kinczewski, of counsel), for appellee.

JUSTICE ROMITI delivered the opinion of the court:

Plaintiff allegedly lost an opportunity to sell its lease on a building because the landlords refused to agree to an assignment. It filed suit against the landlords for both damages sustained from the loss of the sale and damages sustained by being forced to continue operating in the location. The jury found for the plaintiff and defendants appeal. We find that the jury could reasonably have found that defendants did refuse or at least fail to consent to the lease. We also find that there was some evidence from which a jury could possibly conclude plaintiff did have an assignee on the day in question but that the court erred in refusing to instruct the jury that for a consent to an assignment, there had to be an assignee to receive the lease. Finally and most importantly, we find that there was no evidence from which the jury could determine that the assignee was commercially reasonable. Accordingly, we reverse and render judgment for the defendants.

The property at issue was, at the time in question, held in a land trust for various members of the Cuneo family. Francis J. Cuneo (Cuneo) managed the property. The plaintiff is a corporation which leased and operated a bar on Rush Street in Chicago called The Store. The building has now been demolished and a high-rise called Newberry Plaza has been built in its place. (After the attempted sale which is the subject of this litigation plaintiff sold its lease to the developers for $13,700.) On July 19, 1972, plaintiff entered into an agreement with John Barnes individually and for and on behalf of a corporation to be formed for the sale of the tavern business and for certain specified personal property.

The contract contained the following material conditions:

"7. *Liquor License & Lease.* This sale is conditional upon the approval thereof by all necessary agencies and upon the issuance thereof to the Purchaser or the corporation to be formed of an appropriate liquor license or licenses. An application for said liquor license for the sale of liquors, wines and beers by the Purchaser or the corporation to be formed shall be made with all diligence. Any lack of diligence on the part of the Purchaser or the corporation to be formed in prosecuting such application shall constitute a default hereunder.

Further, this sale is conditional upon the Purchaser or the corporation to be formed securing an assignment of the remaining leasehold interest of the Seller from the Lessor of said premises of a lease agreement dated June 23, 1965, or the negotiation of a new lease agreement with said Lessor.

8. Pending issuance or denial of an appropriate liquor license to the Purchaser or the corporation to be formed by appropriate govern-

mental authorities and the assignment of the Seller's remaining leasehold interest in the premises by the lessor or the negotiation of a new lease in the premises with the said lessor, the monies deposited under this agreement shall be held in escrow by the Chicago Title & Trust Company, upon the following terms:

\* \* \*

(b) If an appropriate liquor license is denied to the Purchaser or the corporation to be formed or if there is a failure of assignment of the Seller's remaining leasehold interest from the said lessor or a failure of the Purchaser or the corporation to be formed to secure a new lease agreement upon said premises because of any act or omission or other fault of the Purchaser or the corporation to be formed, the Purchaser shall forfeit, as liquidated damages, all monies deposited under this agreement and upon satisfactory proof to the escrow agent of such denial of disapproval, the escrow agent shall forthwith pay over to the Seller the purchase money held by it and the escrow agent shall thereupon be discharged from all liability therefor, and all rights of the Purchaser and the Seller under this agreement shall thereupon terminate.

(c) If an appropriate liquor license is denied to the Purchaser or the corporation to be formed or if an assignment of the Seller's remaining leasehold interest in said premises to the Purchaser or the corporation to be formed is disapproved by the said lessor or alternatively, if there is no new lease agreement concluded, and if such denial, disapproval or failure is not due to any act or omission or other fault of the Purchaser or the corporation to be formed, then upon satisfactory proof thereof to the escrow agent and the Seller both the escrow agent and the Seller shall forthwith pay over to the Purchaser the purchase money held by them, and the escrow agent and the Seller shall thereupon be discharged from all liability therefore, and the rights of the Purchaser and the Seller under this agreement shall thereupon terminate.

\* \* \*

10. Seller shall permit Purchaser a reasonable opportunity to inspect or have inspected, the business records and books of said business dealing with *The Store*. If a review of said records discloses that gross sales for the past fiscal year does not equal or exceed $200,000.00 then Purchaser shall have a right to terminate this agreement and all monies paid upon the purchase price shall be returned to the Purchaser by the escrow agent and the Seller."

The only issues before this court are (1) whether the defendants refused to assign the lease to the alleged purchasers and (2) whether, if he did, this refusal was unreasonable, *i.e.*, whether plaintiff had carried its

burden of producing a commercially reasonable purchaser. While there were other witnesses who testified as to such matters as damages sustained, only the testimony of Anders Doe, president of plaintiff, William Serpico, the alleged purchasers' attorney, Barry Holt, the plaintiff's original attorney, Francis J. Cuneo, John Barnes, Theresa Bornes and Margerie Bornes, the three stockholders of the would-be purchaser, is material to the consideration of the issues before this court. Doe, Serpico and Holt were all called by the plaintiff; the others by the defendants.

Anders Doe, the president of Jack Frost, testified that the bar was losing money in 1972. It was in bad financial condition. Accordingly, it decided, in April of that year, to sell the business. It found two purchasers, John Barnes and Margerie Bornes. They were to pay $60,000 for the business, $30,000 to be paid into escrow immediately; the balance to be paid upon the conclusion of the deal. It was in fact agreed that if the remainder was paid within 90 days of closing of the transaction, then the agreed purchase price would be reduced by $5,000. The witness also executed a bill of sale agreeing to give good title and sell to buyers a 25-ton air conditioner, although the lease provided that all air conditioning equipment whether placed on premises at time of lease or thereafter should be considered as part of the premises and belonging to the lessor.

Late in August or early in September, Doe contacted Cuneo to try to secure his consent to an assignment of the lease. Cuneo said he was not going to consent to the assignment, that "there was another deal pending and that we didn't have a deal."

William Serpico, an attorney, was contacted by the purchasers to arrange both the purchase of The Store and the incorporation of the business. Serpico drafted the final purchase contract. He did not remember if the earlier contract provided for an option for a new lease. It could have. He did not remember if he drafted any other contract before the one his client finally signed. He testified that after the agreement was signed and executed he organized the corporation. The certificate of incorporation was issued. The stated capital was merely $1,000. There had not been any activity or capitalization in the account. He could not remember if the $1,000 was paid into a certain account, or if the corporation ever had any money. It never got into business.

After the certificate of incorporation was issued, Serpico and Holt opened up the escrow account. They then attempted to conclude the deal, the next step being to secure the assignment of the sellers' leasehold interest. Serpico contacted Cuneo by telephone to set up a meeting; he probably called Cuneo's office, but he did not remember when this took place.

They had a meeting face to face sometime in July or August. It took

place in Cuneo's office. Margerie Bornes, Theresa Bornes, John Barnes, Victor Goulet, Barry Holt, the witness and Cuneo were all there. Serpico did not remember if he arrived with Barry Holt. He did not know if his clients arrived before him. Most likely they came to his (Serpico's) office. He did not know if the meeting started before he arrived. He did not "expect" that his clients would have started without him even if they went there before him. He did not recall if they sat in a waiting room of some kind.

Serpico had no recollection of any conversations about the lease other than what his stated purpose was. He was attempting to secure an assignment of the remaining term of the lease or negotiate a more favorable lease on his clients' behalf. He told Cuneo they were interested in purchasing the business and the condition of the purchase would be to get an assignment, and they were prepared to take an assignment of the lease. Serpico did not remember if he discussed a five year option. He did not have a specific recollection of the terms discussed with Cuneo. He had no recollection of anything that was said between his clients and Cuneo.

Serpico could not remember if he ever specifically said, "Will you give me an assignment." He also could not remember if Cuneo ever specifically said, "I will not give you an assignment." There was some conversation pertaining to the construction and erection of a building on the property which foreclosed any prospect of renegotiating the lease. Serpico did not remember any specifics other than Cuneo did not agree to assign the lease.

There was some question as to the financial ability of his clients to be responsible for the undertaking. Around the time of the meeting Serpico forwarded a resume to Cuneo. This resume was introduced into evidence. It showed that Barnes, who would own 49% of the shares of the corporation and be its president, had worked in seven Playboy or Al Hirt Clubs from 1961-1972 as some form of manager. Margerie Bornes would be the majority stockholder and the principal financial source. She had a AAA rating in Dun & Bradstreet. Other information given about her in the resume was, according to Bornes herself, a "pipedream."

Holt and Serpico left the meeting together. His clients also left at the same time. Serpico later heard either from Holt or Goulet that there would be no assignment. Serpico then called Holt and told him that since his clients could not perform, they wanted their money back. Serpico also wrote a letter stating that his clients at all times had been ready, willing and able to proceed to perform their obligation under the agreement. (Defendants stipulated to this introduction into evidence.) Serpico also testified, without objection, that his clients wanted the deal and were

going to take it as the contract required them to even if they did not get a longer lease.

Over defendants' objection, Serpico was again called by plaintiff in rebuttal. He testified that his clients never instructed him they were not interested in purchasing The Store unless there was a five-year option on the lease. He did not remember that his clients ever told Cuneo they were not interested in purchasing The Store unless there was a five-year option on the lease. He was not certain what the specific conversations were. He was only certain that Cuneo did not offer an assignment or a new lease. At no time during the period he represented his clients did they state to him or to anyone that they would not accept an assignment of the lease.

Serpico admitted that if his clients had insisted the contract have a five-year option or that he negotiate a new and additional lease and he failed to put in the contract, he could be held liable.

Barry Holt, an attorney, testified he was contacted by one of plaintiff's principals to represent them in a prospective sale of the assets of the business to Barnes and some other people. Holt then contacted Victor Goulet from American Invsco, and he put Holt in touch with the attorney for the prospective purchasers, Serpico. They discussed the terms of the agreement, and between them drafted an agreement that was signed by all of the parties. Holt had previously been given by his client a contract drawn up by someone from American Invsco. He mentioned Goulet's name. It was a handwritten agreement and was not sufficient. Holt did not recall if this contract had a provision or an option for an additional lease. Holt did not remember why the first contract was unacceptable. The final contract was signed on July 19. He did not know how many contracts were drawn up before that one. .

After the agreement was drawn up and signed, Holt and Serpico set up the escrow. He then called Cuneo to set up a meeting. Holt did not remember if he talked to Cuneo or to his secretary. There was one face-to-face meeting on August 30, 1972. Serpico and his clients and Goulet were there. Holt told Cuneo that they wanted to discuss transferring the lease for the remainder of the period from plaintiff to Serpico's clients. Holt never discussed a new lease. He knew no new lease was available. He knew there was no option available. He was only interested in obtaining an assignment of the remaining portion of the present lease.

Cuneo said he was not interested in discussing an assignment at that time. He was in the process of selling the building. Holt assured him he was not talking about a new lease or a longer lease. Holt also told him that if he did not assign the lease, Holt's client would stay on the premises until the end of the lease. All they were talking about was assigning the lease for the remainder of the period. Cuneo said he was not interested in

getting into any discussion about any assignments. Holt did not remember if Cuneo ever said, "I will not assign the lease." Holt did not know if there was ever a discussion between Serpico and Cuneo at that time or any other time.

After the meeting, Serpico both called Holt and wrote him a letter stating his clients had been ready, willing and able to perform but the deal had fallen through because "Cuneo has foreclosed any possible alternative solutions," and demanding the return of the $30,000 placed in escrow.

Holt also testified in rebuttal over objection of defendants. He testified that he was never advised that the purchasers would not go through with the purchase of The Store unless there was a five-year option on the lease. Cuneo, at the August 30 meeting, never asked the purchasers if they would accept an assignment of the lease and they never stated that they would not accept one. Holt would not have permitted the return of the $30,000 escrow if they had taken a position that they would not accept an assignment on the lease. He did not want to let the money go but was forced to according to the terms of the agreement. If they had taken the position that they would not accept an assignment of the lease, he would have asked that the $30,000 deposit be forfeited.

Cuneo was the manager of the property, which was in a land trust. He testified that he had been impressed with the three young men who had originally leased the premises. Since he had found that personal signatures on the lease meant more than anything else, he permitted them to assign the lease to a corporation (the plaintiff) as long as all three individuals signed the lease and they notified him of any changes in stock ownership in the company during the term of the lease. They were immediately successful and for many years were good tenants. The last two or three years, they were slow on the rent, and several times their dramshop insurance was cancelled for nonpayment of premiums. According to the last insurance policy, the gross liquor receipts for 1971 were $166,000.

In 1972 Holt called Cuneo and told him they had a prospective purchaser for the business. Cuneo told him to submit the usual references and backgrounds and a brief history of their deal including figures. He received the various documents in a day or two. Cuneo then called Serpico and pointed out that no additional lease was available; there was no option privilege. He and Serpico had several more talks. Serpico told him that he realized the contract was "sort of a mess." He said a second contract was being drafted. Cuneo asked for a copy of it when it was executed. He never received one, however.

There was a meeting at Cuneo's office August 29 or 30, 1972. Margerie Bornes, Theresa Bornes, Barnes, Holt, Serpico and Victor Goulet were all there. Cuneo told them that because of the negotiations

for the sale of the property there was no chance for any additional lease given in connection with an assignment. He then asked the purchasers if they were willing to proceed with the deal on the basis of an assignment of the present 21-month lease. They said they were not. Cuneo then said that since there was no assignee, there was no use in going any further. Because they had told him they did not want to be assignees, Cuneo did not check their references. He stated that he would have required Margerie Bornes to guarantee the corporate lease. Cuneo also indicated that the provisions in the sales contract conditioning sale on the gross sales equalling or exceeding $200,000 had given him considerable concern since the dramshop policy listed the gross liquor receipts for the past year as $166,000.

Cuneo denied that he had ever refused to consent to the lease as it then stood.

John Barnes testified that in June 1972 he saw an ad for the sale of a Rush Street Bar. At this time he was unemployed, having left LePub. Barnes and Theresa Bornes met a gentleman from American Investment Corporation at Carron's Restaurant. There were two meetings as the broker did not have the full information at first. The second time they drew up a lease agreement for 30 days with a deposit of $200. In it, it was stipulated there was a five-year option. There were other signatures on the contract. Barnes was the last to sign.

Originally, Barnes said he signed only one document on that date. On cross-examination he was shown a contract for the sale of real estate bearing that date. That contract provided that Barnes or a nominee agreed to purchase the real estate known as The Store (it is obvious of course that plaintiff could not sell the real estate since it did not own it) plus certain personal property including air conditioner. Only Barnes' signature appears on the document. The broker is listed as Victor N. Goulet. While there are several written stipulations on the back, there is no requirement of a five-year option. There is also nothing indicating the agreement is only for 30 days. The agreement appears to be incomplete; the last written stipulation reading "L. Purch." After reading this document, he agreed that he obviously signed more than one document.

After Mr. and Mrs. Bornes, Theresa's parents, flew from their home in Arizona to Chicago to look at the building, they contacted Serpico, who drew up corporation papers and also a new purchase agreement. The agreement failed to have any stipulation as to the five-year option in it.

Serpico drew up the corporate papers which they signed and they were incorporated. They had agreed who would be the officers of the corporation agreement and had determined who would get what. They had discussed how much money it would take. It was understood that Margerie Bornes would invest over $30,000 and they had to have

operating capital. But when asked if they had had any dollar amounts in mind as to operating capital, Barnes answered "We didn't get that far down the road." They had nothing signed as to matters such as financing.

When they met at Cuneo's office, it came out that there was no five-year option. Since there was no option, they did not want the deal and it fell through. They told all of them they did not want the deal. Barnes had not authorized anyone to remove a five-year option from the agreement presented by American Invsco. He did not realize until after the fact that the agreement he later signed did not contain a five-year option.

Barnes never asked Cuneo to assign the remaining 21 months of the lease to them. He also testified that Cuneo never refused to assign the lease to them.

Theresa Bornes testified that she had been working as a waitress at either LePub or Tenement Square. She and Barnes decided to go into business together. They saw an advertisement for The Store and telephoned. A man from the real estate office told them there was a "year and something" on the lease and also an option. Her parents came from Arizona and looked at it. They liked it, so they started to incorporate. Then they went over to get the lease from Cuneo. Cuneo told them there was no option. They then told Cuneo they were not interested unless there was a five-year option. Cuneo never refused to consent to the assignment of the lease; they did not want it.

Margerie Bornes, Theresa's mother, testified that they first heard of The Store when John Barnes telephoned her husband. It was then that he told them there was a five-year option. They were interested and came to Chicago to look at The Store. It appeared to be a good deal so they decided to form a corporation. John and Theresa were to run it and the witness and her husband were to put money in it. The witness testified Serpico's memorandum detailing her financial background stated a "pipedream." Her net worth was only $1 million at that time, not between $4 and $5 million as represented.

Margerie Bornes was not a party to the purchase agreement. The intention was that the corporation which they were forming would buy the business. She and her husband, Serpico, John Barnes and Theresa met with Cuneo. Also there were Holt and Victor Goulet who were representing the other people. As they came into Cuneo's general office, he greeted them cordially but indicated he did not understand why they were there. They said they wanted the balance of the lease with the five-year option put into the corporation's name. He told them there was not going to be a five-year option; the building was going to be torn down. He was willing to give them a lease for the balance that was there but they said no; if there was going to be no building, there was no reason to pursue it further.

Margerie Bornes testified that her own personal funds were used for the $30,000 deposit. She recovered the money because of the shortness of the terms.

Before trial, the trial court apparently instructed the jury that they were to decide whether or not Cuneo refused an assignment of the lease. The court's instruction itself is not in the record; however, defendants' objection on the grounds the jury should have been told that the question of the assignment had to do with whether it was an arbitrary, capricious, unreasonable refusal to assign is in the record. The court in the colloquy appeared to agree the general statement was made and responded that the jury would be properly instructed at the close of the case. Defendants did not move for a mistrial.

At the close of the case the jury was instructed that plaintiff had the burden of proof to show (1) that plaintiff and the purchasers requested consent to an assignment of the lease; (2) that Cuneo wrongfully and without just cause withheld his consent to the assignment of the lease. The assignee had to be acceptable according to reasonable commercial standards. The jury was told that the law does not say what reasonable commercial standards are. That was for the jury to decide; (3) the reason the sale was not consummated was because no consent to the assignment was given; (4) the plaintiff suffered damages due to the above. The court refused to give defendants instructions that:

"Consent to an assignment of a lease requires three parties:

1. A landlord to give consent.
2. A lessee to assign the lease.
3. An assignee to accept the lease."

I

■■ There was evidence from which the jury could conclude that Cuneo refused to consent to the assignment. It is true that the would-be purchasers and Cuneo all testified that he did not refuse to consent. But both Holt and Doe testified that when they asked him to consent to the assignment, Cuneo said he was not interested in discussing it. A refusal does not have to be in precise and specific words. It is not necessary that one say "I will not consent." A refusal to even consider a request is as much a refusal to consent as an express refusal to consent. It is true as defendants argue that the only evidence for plaintiff was from interested parties whereas Theresa and Margerie Bornes and John Barnes were not interested parties. Indeed, John Barnes was testifying against his own interest when he testified the deal fell through because they said they did not want the deal. Under the contract of sale which he signed individually as well as in a representative capacity, he was liable for $30,000 to plaintiff if the consent was refused due to purchaser's fault. The credibility of the

witnesses is, however, a question peculiarly within the province of the trier of facts. (*Myers v. Arnold* (1980), 83 Ill. App. 3d 1, 403 N.E.2d 316; *McCommons v. Moorman Manufacturing* (1980), 81 Ill. App. 3d 708, 401 N.E.2d 1354; *Clifton v. Nardi* (1978), 65 Ill. App. 3d 344, 382 N.E.2d 514.) A verdict of a jury will not be disturbed on appeal where there is some evidence to support it (*Derrico v. Clark Equipment Co.* (1980), 91 Ill. App. 3d 4, 413 N.E.2d 1345; *Fuery v. Rego* (1979), 71 Ill. App. 3d 739, 390 N.E.2d 97, *appeal denied* (1979), 79 Ill. 2d 611; *Cora v. Chicago Housing Authority* (1971), 131 Ill. App. 2d 23, 268 N.E.2d 497), even where as here it is supported by a smaller number of witnesses. *Russell v. Consolidated Forwarding Corp.* (1945), 327 Ill. App. 204, 62 N.E.2d 44 (abstract); *Hellwig v. Lomelino* (1941), 309 Ill. App. 369, 33 N.E.2d 174, *appeal denied*; *Rogers v. Smith* (1922), 227 Ill. App. 70; *Chicago City Railway Co. v. Donnelly* (1907), 136 Ill. App. 204, *aff'd* (1908), 235 Ill. 35, 85 N.E. 233.

## II

However, contrary to the preliminary instruction apparently given to the jury, the principal issue in this case was not whether Cuneo refused to give his consent but whether to quote the complaint he "arbitrarily, capriciously, unreasonably and without just cause" withheld his consent.
■■ It is well established in Illinois that where a lease forbids any sublease or assignment without the consent of the lessor, the lessor cannot unreasonably withhold his consent to a sublease. (*Arrington v. Walter E. Heller International Corp.* (1975), 30 Ill. App. 3d 631, 333 N.E.2d 50; *Reget v. Dempsey-Tegler & Co.* (1966), 70 Ill. App. 2d 32, 216 N.E.2d 500; *Scheinfeld v. Muntz TV, Inc.* (1966), 67 Ill. App. 2d 8, 214 N.E.2d 506, *appeal denied* (1966), 33 Ill. 2d 628; *Wohl v. Yelen* (1959), 22 Ill. App. 2d 455, 161 N.E.2d 339; *Mowatt v. 1540 Lake Shore Drive Corp.* (7th Cir. 1967), 385 F.2d 135.) But a condition precedent to the lessor's duty to accept a sublessee is the tender to him of a suitable tenant as sublessee. (*Scheinfeld v. Muntz TV, Inc.* (1966), 67 Ill. App. 2d 8, 214 N.E.2d 506, *appeal denied* (1966), 33 Ill. 2d 628.) Thus before the defendants could possibly be held liable for failure to consent to a transfer of the lease, the plaintiff had the burden of proving (*Reget v. Dempsey-Tegler & Co.* (1966), 70 Ill. App. 2d 32, 216 N.E.2d 500), that it had tendered a person who was "ready, willing and able" to take over the lease and who, at the very least, met reasonable commercial standards.

The preponderance of the evidence in the record is to the effect that by August 30, 1972, the plaintiff did not have anyone who was "ready, willing and able" to take over the lease. All three of the intended purchasers testified that once they learned there was no five-year option

they were unwilling to accept the lease. However, in light of their agent Serpico's testimony that the purchasers had been willing to fulfill the contract we are not willing to say that there was no evidence at all in the record to support a finding that there was an assignee ready to take the lease. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

■■■ Nevertheless, since the evidence was strongly conflicting and the merits of the case doubtful, it was essential that the jury be properly and fully instructed. (*Clemons v. Alton & Southern R.R. Co.* (1977), 56 Ill. App. 3d 328, 370 N.E.2d 679, *appeal denied* (1978), 71 Ill. 2d 602.) Accordingly, it was prejudicially erroneous for the court to refuse to give defendants' instruction as to the necessary parties to an assignment. This instruction would have correctly instructed the jury that consent to an assignment of a lease requires three parties, including an assignee, to accept the lease. Since one of the principal issues for the jury to determine was whether on August 30, 1972, there was an assignee to accept the lease, it was necessary for the jury to be instructed on this issue and this the court, by refusing the instruction, failed to do. The failure to give an instruction is not reversible error where the other instructions cover the matter dealt with in the refused instruction. (*McCormick v. Bucyrus-Erie Co.* (1980), 81 Ill. App. 3d 154, 400 N.E.2d 1009.) But we cannot agree with plaintiff's contention that the issue instruction sufficiently covered the question since it instructed the jury that it must find that both plaintiff and purchasers requested consent to the lease and that Cuneo's refusal was the reason the sale was not consummated. Properly instructed, the jury could have found from the evidence that the purchasers through their agent Serpico requested consent to the assignment but that by August 30 there no longer was an assignee to accept the lease. The evidence is clear that Cuneo's refusal or failure to consent to an assignment was at least one reason the sale was not consummated and was the reason used by the purchasers through their attorney to recover the escrow. But that does not mean that the purchasers were otherwise willing to perform. Precisely for that reason it was essential that the jury be instructed that there must be an assignee to accept the lease, particularly in light of the fact the jury had been erroneously instructed before trial that in effect all it had to determine was whether Cuneo had refused to consent to the lease. This error was not properly preserved since it was not set forth in the record (*Woodrick v. Smith Gas Service, Inc.* (1967), 87 Ill. App. 2d 88, 230 N.E.2d 508), and there was no timely motion for a mistrial (*Gaffner v. Meier* (1948), 336 Ill. App. 44, 82 N.E.2d 818); nevertheless, we can consider the effect of that remark in considering the prejudicial effect of the later failure to instruct.

## III

However, it is not necessary for the case to be remanded for a new trial since there was no evidence from which the jury could have determined that the would-be purchaser, the corporation, was a commercially reasonable assignee, and thus that the defendants acted unreasonably and arbitrarily in refusing consent.

■■ To show that the defendants unreasonably rejected the transfer, plaintiff must prove that the proposed purchaser met reasonable commercial standards. (*Reget v. Dempsey-Tegler & Co.* (1966), 70 Ill. App. 2d 32, 216 N.E.2d 500.) While other factors may at times be considered (Annot., 54 A.L.R.3d 679 (1973); see, for example, *Jones v. Andy Griffith Products, Inc.* (1978), 35 N.C. App. 170, 241 S.E.2d 140, *appeal denied* (1978), 295 N.C. 90, 244 S.E.2d 258), one of the most important factors is the financial responsibility of the would-be sublessee. (*Reget v. Dempsey-Tegler & Co.* (1966), 70 Ill. App. 2d 32, 216 N.E.2d 500; *Fernandez v. Vazquez* (Fla. App. 1981), 397 So. 2d 1171; *American Book Co. v. Yeshiva University Development Foundation, Inc.* (1969), 59 Misc. 2d 31, 297 N.Y.S.2d 156.) Thus where the proposed transferee is insolvent, or of dubious financial responsibility, or has a poor payment record, the landlord's refusal to consent will not be found to be unreasonable. (*Reget v. Dempsey-Tegler & Co.* (1966), 70 Ill. App. 2d 32, 216 N.E.2d 500; *Mowatt v. 1540 Lake Shore Drive Corp.* (7th Cir. 1967), 385 F.2d 135; *Riggs v. Murdock* (1969), 10 Ariz. App. 248, 458 P.2d 115; and see *Wiggins v. Fane* (1979), 71 App. Div. 2d 1039, 420 N.Y.S.2d 46.) As stated in *Reget*:

"The burden of proving the Norrisses were acceptable subtenants rested with defendant. Hinde v. Madansky, 161 Ill. App. 216. If a party asserts a claim for damages, the claim is his to prove. So, too, if a party counterclaims, the counterclaim is his to prove. To show that the Regets unreasonably rejected a subtenant the defendant must show the proposed subtenant met reasonable commercial standards. Defendant offered no evidence of the Norrisses' suitability as subtenants save a $400 deposit on the proposed sublease and the assurance that it would remain liable for the rest.

We believe the sublessee's credit is a meaningful factor in the lessor's determination of the proferred subtenants acceptability. Regardless of the type [of] business conducted by the proposed subtenant, the enterprise has a tenor which can detract from the value of the entire premises. Thus a given business can be acceptable in name, but unacceptable in the way it is conducted. The capital and credit of an entrepreneur controls to some extent the manner of his business. So, too, does the financial responsibility bear on the day-to-day upkeep, and day-to-day appearance of the premises. Another more remote consideration based to some

degree on financial strength involves labor difficulties. So, too, would a series of rapid turnovers caused by the weakness of subtenants' businesses detract from the value of the overall premises.

\* \* \*

The burden was the defendant's and no evidence of suitability was introduced." (70 Ill. App. 2d 32, 37-38.)

Furthermore, regardless of what might later be shown in court, the lessor is justified in refusing his consent until satisfactory proof of financial ability and responsibility is shown. *Johnson v. Jaquith* (Fla. App. 1966), 189 So. 2d 827; *Fairchild Realty Co. v. Spiegel, Inc.* (1957), 246 N.C. 458, 98 S.E.2d 871.

A search of the record discloses that there is no evidence that the corporation which was proposed as assignee was financially responsible. The corporation was incorporated but it had never gotten into business. Its stated capital was $1,000, but there was no evidence that the corporation had any money at all. One of the shareholders was wealthy but she was under no legal obligation to put any particular amount into the corporation, other than the $30,000 already put into escrow for the benefit of plaintiff.

Furthermore, the evidence discloses that Cuneo was given no information establishing the corporation's financial responsibility although, as already noted, a landlord is not required to consent to a transfer of the lease until he is given satisfactory proof of the transferee's financial responsibility. According to the testimony at trial, all of the information given to Cuneo related to Barnes and Margerie Bornes and none related to the corporation, the proposed assignee. It is true that John Barnes was also a party to the sale but there was no evidence he was financially responsible. It is also true that Margerie Bornes was financially responsible, but there is no evidence that she was willing to guarantee the lease or had told Cuneo she was willing.

Furthermore, it was established in *Scheinfeld v. Muntz TV, Inc.* (1966), 67 Ill. App. 2d 8, 214 N.E.2d 506, *appeal denied* (1966), 33 Ill. 2d 628, that landlord does not have to release the lessor from further responsibility. (And see *Wohl v. Yelen* (1959), 22 Ill. App. 2d 455, 161 N.E.2d 339.) In the present case, unlike the other Illinois cases (*Reget v. Dempsey-Tegler & Co., Inc.* (1966), 70 Ill. App. 2d 32, 216 N.E.2d 500; *Scheinfeld v. Muntz TV, Inc.* (1966), 67 Ill. App. 2d 8, 214 N.E.2d 506, *appeal denied* (1966), 33 Ill. 2d 628; *Wohl v. Yelen* (1959), 22 Ill. App. 2d 455, 161 N.E.2d 339), the plaintiff sought to assign rather than sublease. But there was no evidence that plaintiff was willing to guarantee performance of the lease by the assignee and that plaintiff had communicated its willingness to Cuneo.

948

■■ Since there was no evidence from which the jury could have determined that the purchasers met reasonable commercial standards there was no case for the jury. (*Pedrick v. Peoria & Eastern Railroad Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) Accordingly, the judgment of the trial court is reversed and judgment is entered for defendants.

Reversed.

JOHNSON, P. J., and JIGANTI, J., concur.