GOLF MANAGEMENT COMPANY, INC., Plaintiff-Appellant and Counter-defendant, v. EVENING TIDES WATERBEDS, INC., *et al.*, Defendants-Appellees and Counterplaintiffs.

First District (3rd Division)   No. 1—89—0866

Opinion filed April 24, 1991.

Daniel J. Stohr, of Chicago, for appellant.

Burke, Wilson & McIlvaine, of Chicago (Stephen C. Voris and Clinton J. Wesolik, of counsel), for appellees.

JUSTICE WHITE delivered the opinion of the court:

Plaintiff and counterdefendant Golf Management Company, Inc. (Golf), appeals from a jury verdict and award of damages in favor of defendant and counterplaintiff Evening Tides Waterbeds, Inc. (Evening Tides).

On August 11, 1981, Golf and Evening Tides entered into a commercial lease for property located at 1735-39 West Golf Road in the Golf Plaza Shopping Center in Mt. Prospect, Illinois. The lease ran from October 1, 1981, until September 30, 1986, and provided that the property could not be subleased without the previous written consent of Golf. The lease also provided for a base rent of $6.25 per square foot which, together with insurance, real estate taxes, and other expenses, amounted to a monthly payment of $5,184.75. In addition, Evening Tides agreed to pay as rent 5% of its sales in excess of a certain amount.

On July 1, 1984, 25 months before the expiration of its lease, Evening Tides vacated the property and stopped paying rent. In June 1985, Golf filed suit against Evening Tides charging it with breach of the lease contract and seeking to recover $67,124.35 in unpaid rent.

Evening Tides filed an answer and affirmative defense alleging that Golf had breached the terms of the lease by unreasonably refusing to accept the subtenants proffered by Evening Tides. Evening Tides argued that Golf's breach relieved Evening Tides of any obligations and duties under the lease. Evening Tides also filed a counterclaim against Golf, seeking damages for Golf's refusal to accept the proposed subtenants.

At trial, Golf called Robert Krueger, president of Evening Tides, as an adverse witness. Krueger testified that on August 11, 1981, he entered into a five-year lease with Golf for the property located at 1735-39 Golf Road in Mount Prospect; that he operated a furniture store at that location; that he was frequently late in paying the rent on the property; and that after paying the June 1984 rent he made no further payments under the lease. Krueger was Golf's only witness and following his testimony, Golf rested its case.

Evening Tides' first witness was Salvatore DiMucci, president of Golf. DiMucci testified that he received three offers for a sublease of

the Evening Tides property. The first offer was made by Prakash Jotwani and Ram Shahani. DiMucci stated that he refused this offer because Jotwani and Shahani wanted to sublease only a portion of the space.

DiMucci stated that an offer to sublease the Evening Tides space also was made by John Torris. DiMucci stated that he refused this offer because Torris wanted to use the space for a bar and restaurant and the property was not zoned for the sale of liquor.

DiMucci testified that another offer for a sublease was made by Jerome Weinberg, who wanted to operate a furniture store in the Evening Tides space. DiMucci stated that Golf entered into a new lease with Weinberg at a base rent of $5,696, or approximately $10 per square foot, but Weinberg never took possession of the property. DiMucci stated that he entered into a new lease with Weinberg rather than a sublease because Weinberg requested a new lease.

In June 1986, a portion of the property was leased to a bakery at a rental equal to $8.40 per square foot. DiMucci stated that the bakery's rent was lower than Weinberg's because the space was smaller and in the rear of the shopping center.

Evening Tides' other witnesses included Martin Meadow, a former Golf employee who testified that it was DiMucci's policy to refuse subleases. Also testifying for Evening Tides were Krueger, Ram Shahani, John Torris, and Jerome Weinberg.

Shahani, Torris, and Weinberg all testified that they were interested in subleasing Evening Tides' property, but were told that they would have to enter into new leases at a higher rent. In addition, all testified that before entering into negotiations with Golf for a new lease, they were required to pay $50 for a credit investigation.

According to Evening Tides' witnesses, in March 1984 Jotwani and Roshani met with Krueger and expressed an interest in subleasing the property for operation of a "Computerland" franchise. Initially, Jotwani and Roshani wanted to lease only a portion of the property, but after being told that DiMucci would not allow the space to be divided, they agreed to take the entire space. Krueger testified that he, Jotwani, and Shahani negotiated a sublease under which Jotwani and Shahani agreed to pay $4,737 of the monthly rent and Krueger agreed to pay the difference between that amount and the gross monthly rent of $5,184. The agreement was reduced to writing in a letter of intent signed May 9, 1984.

The letter of intent stated that the agreement was conditioned upon Jotwani and Shahani obtaining an option to renew the lease after September 1986 and upon the lease being approved by Compu-

terland's national headquarters. In addition to the letter of intent, Jotwani and Shahani presented personal financial statements to Golf. These statements showed Jotwani's net worth to be $281,605 and Shahani's to be $266,595.

Krueger testified that when he presented the letter of intent to Golf's employee Tom Gimino, Gimino informed him that a sublease would not be allowed and that Jotwani and Shahani would have to enter into a new lease. Shahani testified that he was told that Golf wanted a direct lease rather than a sublease and that the rent under the new lease would be $13 per square foot, more than twice the amount Evening Tides was paying. Jotwani and Shahani did not enter into a new lease with Golf, but leased property elsewhere. Shahani testified that this was because the rent Golf requested was too high.

In July 1984, after Evening Tides vacated the Golf Road property, Krueger made a second attempt to sublease. Krueger entered into negotiations with John Torris, who wanted to operate a restaurant and bar. Both Torris and Krueger testified that Torris wanted to sublease the property, but that this was not allowed. Krueger testified that Torris originally agreed to sublease the property from Krueger for $6,500 per month at a profit to Krueger of approximately $1,300 per month. After Golf refused to allow the sublease, Torris agreed to enter into a new lease with Golf.

On July 16, 1984, Krueger and Torris signed a letter of intent, in which Torris agreed to enter into a new three-year lease at a rent of $6,500 per month. The letter also stated that Torris' offer was subject to his obtaining a liquor license. Torris never signed the new lease, and in a letter dated July 30, 1984, he stated that this was because he was unwilling to pay annual increases in the $6,500-per-month rent. Torris testified that another reason he did not sign the lease was because he did not like some of the terms it contained, including requirements that he pay Golf 8% of his gross sales, that Golf approve the cash registers used in the store, and that he submit to arbitrary audits of his gross sales.

In August 1984, Krueger was contacted by Weinberg, who expressed an interest in subleasing the property for operation of a furniture store. After meeting with Krueger, Weinberg drafted a letter in which he stated he would be willing to sublease the property at a $9-per-square-foot base rent "for the balance of Evening Tides' lease plus 3 additional years with a 5 year option after that."

Weinberg and Krueger testified that when they met with DiMucci and Gimino, they were informed that Weinberg would not be allowed to sublease the property and that the only type of lease that would be

allowed was a direct lease with Golf. On September 20, 1984, Weinberg sent a letter of intent to Krueger stating that Weinberg would be willing to sign a new lease with Golf for a 10-year term at a rent of $10 per square foot plus a 5% increase per year.

Weinberg and Krueger again met with DiMucci and Gimino on October 1, 1984, at which time Weinberg made a security deposit equal to two months' rent ($11,000) and was presented with a lease. Weinberg testified that during the meeting, DiMucci demanded an additional month's security and told him that he would be required to sell furniture at wholesale costs to DiMucci and DiMucci's family and employees. Weinberg signed the lease and next to his signature he wrote the phrase "contingent on my accountant's approval." It was stated in an offer of proof that Weinberg included this phrase because he was concerned about the requirement that he sell furniture at cost to DiMucci.

Weinberg testified that later, after considering the additional demands made by DiMucci, he wrote Golf stating that he was withdrawing his offer to lease because he could not obtain financing for the store. Weinberg admitted that this statement was untrue.

Evening Tides' final witness was Hugh Robinson. Robinson, who was called as an expert in the area of commercial leases, testified that the rents Golf demanded of Shahani, Torris, and Weinberg were excessive. Robinson testified that in his opinion, the rent should have been in the range of $6.50 to $7.50 per square foot.

At the close of Evening Tides' case, Golf made a motion for a directed verdict on Evening Tides' counterclaim. The trial court reserved its ruling on Golf's motion and the case was submitted to the jury. The jury returned a verdict against Golf and in favor of Evening Tides on both the complaint and the counterclaim. The jury also assessed damages against Golf in the amount of $35,000. Golf's motions for judgment notwithstanding the verdict or for a new trial were denied. This appeal followed.

In its appeal, Golf argues that the jury's verdict should be overturned. Golf contends that it could not be found to have unreasonably refused its consent for a transfer of the lease because Evening Tides failed to tender a suitable subtenant.

■ Under Illinois law, where a lease forbids any sublease or assignment without the consent of a landlord, the landlord cannot unreasonably withhold his consent to a sublease. (*Jack Frost Sales, Inc. v. Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 933, 433 N.E.2d 941; *Reget v. Dempsey-Tegler & Co.* (1966), 70 Ill. App. 2d 32, 216 N.E.2d 500.) However, before a landlord can be held liable for

failure to consent to a transfer of a lease, a tenant must meet its burden of proving that it tendered a subtenant who was ready, willing, and able to take over the lease and who, at the very least, met reasonable commercial standards. *Jack Frost*, 104 Ill. App. 3d at 944.

Relying on *Jack Frost*, Golf argues that Evening Tides did not meet its burden of proving that the subtenants it tendered were ready, willing, and able to take over the lease. Golf contends that the offer made by Jotwani and Shahani was insufficient because Jotwani and Shahani wanted an option to renew the lease and because the offer was contingent upon the approval of Computerland's national headquarters. Golf claims that Torris' offer was insufficient because Torris also wanted an option and because this offer was contingent upon Torris obtaining a liquor license. Finally, Golf claims that Weinberg's offer also was insufficient because he signed the lease "contingent on my accountant's approval." We believe that Golf's arguments are based on a misinterpretation of our decision in *Jack Frost*.

In *Jack Frost*, this court reversed a jury verdict in favor of a plaintiff who had attempted to assign its interest in a lease. The plaintiff operated a bar in the leased premises and in 1972 it entered into a contract with a yet to be formed corporation for the sale of the business and certain personal property. The sale was conditioned upon the issuance of a liquor license to the corporation and upon the corporation securing an assignment of the remaining leasehold interest of the plaintiff. The sale failed to go through and plaintiff sued the landlord alleging that the landlord unreasonably withheld its consent to the lease assignment.

At the trial, both plaintiff's president and the attorney for the purchasers testified that the landlord refused to consent to the assignment. However, the landlord and three of the purchasers testified that the purchasers wanted an option for a new five-year lease and that the purchasers turned down the assignment when they were informed that the building housing the bar was to be demolished at the end of plaintiff's lease.

On appeal, this court ruled that the jury's verdict for plaintiff should be reversed because the jury had not been properly instructed and because there was no evidence that the proposed purchasers met reasonable commercial standards. However, despite evidence that the sale was conditioned upon the issuance of a liquor license and testimony that the purchasers refused to consummate the sale because there was no option to extend the lease, this court also held that it was unwilling to say that there was no evidence to support the jury's finding that there was an assignee ready to take the lease. In the

present case, we again are unwilling to say that there was no evidence to support the jury's finding that there was an assignee ready to take the lease.

■■ It is well settled that in reviewing a jury's verdict, a court of appeal should not substitute its judgment for that of the jury and set aside a verdict unless there is no reasonable basis for the verdict shown in the record. (*Hernandez v. Lukas* (1982), 104 Ill. App. 3d 692, 432 N.E.2d 1028.) A jury's findings should not be disturbed unless the reviewing court is able to say that there is no evidence that tends to support the verdict. (*Zelinski v. Security Lumber Co.* (1985), 133 Ill. App. 3d 927, 479 N.E.2d 1091.) If there is evidence which supports the jury's verdict, this court should not interfere with the result. (*Derrico v. Clark Equipment Co.* (1980), 91 Ill. App. 3d 4, 413 N.E.2d 1345.) We find that there was evidence in the record to support a conclusion that Evening Tides tendered ready, willing, and able subtenants and that Golf's refusal to consent to a sublease was unreasonable.

Considering first the offer from Jotwani and Shahani, we note that in addition to the unrebutted testimony of a former Golf employee that it was Golf's policy to refuse subleases, there was testimony from Krueger and Shahani that Golf refused to allow a sublease of Evening Tides' space and would consent only to a new lease at more than twice Evening Tides' rent. As for Golf's claim that the offer was conditional because of Jotwani and Shahani's desire for an option, Shahani testified that he and Jotwani wanted to sublease the space and were willing to negotiate with Golf concerning an option to renew.

■ In *Jack Frost*, we refused to hold that the desire for an option precluded a jury from finding that the purchasers were ready to assume the lease, even though the building was scheduled to be demolished and no negotiations for an option were possible. We will not hold in this case that a desire for an option precludes a jury from finding that a subtenant was ready to take a lease, when there was testimony that he wanted the property and was willing to negotiate for an extension of the lease and there was no evidence that an extension would not have been possible.

In arguing that Jotwani and Shahani's offer was insufficient, Golf makes the additional claim that the offer did not meet reasonable commercial standards because it was conditioned upon the approval of the Computerland national headquarters and this approval had not been obtained when Jotwani and Shahani first contacted Golf about subleasing the space. This argument is without merit.

In *Vranas & Associates, Inc. v. Family Pride Finer Foods, Inc.* (1986), 147 Ill. App. 3d 995, 498 N.E.2d 333, a tenant who was denied permission to sublease presented evidence that the proposed subtenant entered into a similar transaction with another party several months later. The appellate court held that this evidence was admissible to counter the landlord's contention that the subtenant was not ready, willing, and able and would not have been able to consummate the deal in question. 147 Ill. App. 3d at 1005-06.

■ In the present case, Shahani testified that the approval of the Computerland national headquarters eventually was obtained and that he and Jotwani later opened a Computerland store at another location. We believe that this testimony rebuts Golf's claim that Jotwani and Shahani's offer was not commercially reasonable.

Also on the issue of commercial reasonableness, we note that Shahani testified that he and Jotwani paid Golf $50 for a credit investigation, that they gave Golf copies of their personal financial statements, and that, subsequently, Golf attempted to negotiate a new lease with them. From these facts, a jury could conclude that Golf found Jotwani and Shahani to be commercially reasonable tenants. See *Cowan v. Chalamidas* (1982), 98 N.M. 14, 644 P.2d 528 (holding that evidence that, shortly after refusing to consent to a sublease to two individuals, a landlord leased the property directly to the same two individuals established that the landlord considered them to be acceptable tenants).

Turning to the offers made by Torris and Weinberg, both testified that they wanted to sublease and that it was only after Golf demanded a new lease at a higher rent and set additional requirements that they decided not to take the property. In addition, like Shahani, Torris and Weinberg testified that they paid for credit investigations and that Golf subsequently attempted to enter into new leases with them. A jury could conclude from this testimony that Golf found Torris and Weinberg to be commercially suitable and that its refusal to allow them to sublease was unreasonable.

Golf also argues that Evening Tides is not entitled to take advantage of the terms of the contract allowing a sublease of the property because it was in breach of the contract. Golf contends that by abandoning the property on July 1, 1984, Evening Tides breached its lease contract and therefore could not avail itself of the terms of the contract or recover damages.

■ We previously have held there was sufficient evidence that Evening Tides presented suitable subtenants in Jotwani and Shahani and that Golf's refusal to allow a sublease was unreasonable. Thus, it was Golf who initially breached the lease and Evening Tides is not

precluded from taking advantage of the lease terms or recovering damages.

█ Golf finally argues that it was denied a fair trial by the cumulative effect of errors in the trial court. Golf argues that comments made by Evening Tides' attorney in opening and closing arguments and the admission of irrelevant evidence were improper and served only to inflame the passions of the jury. We have reviewed the comments and evidence complained of and we are not persuaded they were so prejudicial as to deprive Golf of a fair trial. See *Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill. App. 3d 445, 501 N.E.2d 830.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CERDA, P.J., and RIZZI, J., concur.