NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit
Chicago, Illinois 60604**

Argued September 15, 2008
Decided November 13, 2008

**Before**

MICHAEL S. KANNE, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 07-3221

| | |
|---|---|
| SHREEJI KRUPA, INCORPORATED | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *Plaintiff-Appellant,* | |
| *v.* | No. 04 C 7809 |
| LEONARDI ENTERPRISES, authorized agent of an undisclosed principal or principals, Undisclosed Principal Owners and/or Lessors of the commercial property located at 55 St. Johns Avenue, Highland Park, Illinois, DONNA J. LEONARDI, also known as DONNA WEIRICH, and other currently unknown owners, joint venturers and/or partners of LEONARDI ENTERPRISES, | John W. Darrah, *Judge*. |
| *Defendants-Appellees.* | |

## O R D E R

Two issues were presented to the jury that tried this case last year. The first, and the reason the case was tried in federal court, was a claim that the plaintiff, Shreeji Krupa, Inc., whose sole shareholder and owner is Shaurin B. Mehta, was the victim of national origin

discrimination in violation of the civil rights statutes, 42 U.S.C. §§ 1981 and 1982.  The second concerned the plaintiff's claim that the defendants breached a provision of a lease by unreasonably withholding their consent to its reassignment to a third party.  The jury rejected the first claim but liked the second and returned a verdict in the plaintiff's favor for $152,500.  The trial court, however, was not impressed with the plaintiff's win, so it set the verdict aside on the defendants' post-trial motion.  That decision is now before us on the plaintiff's appeal.

Mehta, a man of East Indian national origin, purchased the assets of a convenience store in Highland Park, Illinois, in 1997 through his corporation, Shreeji Krupa, Inc.  For simplicity's sake, and because Mehta and his corporation are essentially the same, we refer to both as Mehta.  Contemporaneously with the purchase, and an essential part of it, Mehta accepted the assignment of an existing commercial lease for the property.  The lessor was the defendant, Leonardi Enterprises.  Leonardi Enterprises was a partnership, the day-to-day dealings of which were handled by Donna Leonardi.

When the lease was expiring, Leonardi and Mehta agreed to extend it, with one very important amendment.  They agreed that either party could cancel the lease by giving 60 days written notice.  Leonardi testified that Mehta asked for this flexibility because he had back problems, and in the event he needed surgery he wanted to be able to get out of the lease.  Leonardi, who was sympathetic to Mehta's health problems, said she agreed to include the cancellation provision only after it was made mutual.  Although Mehta confirmed that he suffered from a bad back, he testified that Leonardi inserted the provision and he had no choice but to agree to it since he wanted to continue to run his store.

With a year left on this extended lease, Mehta's bad back caught up with him, and doctors advised that he might need surgery to alleviate the pain.  With that news, he began looking to sell his store, and it wasn't long before he found someone who was interested.  The prospective buyer, Alpesh Patel, visited the store a couple of times and decided that it was a good investment.  During these visits, Patel reviewed the day's sales receipts, which showed that the store grossed around $1,000 daily (although the store's business was apparently very seasonal because, according to Mehta's tax returns, on average it grossed far less).  Mehta and Patel eventually entered into an asset purchase agreement in which Mehta agreed to hand over the store in exchange for $120,000, plus 65 percent of the retail value of the inventory at closing.  That agreement, however, was subject to Patel's "review . . . of [the store's] Lease and assuming the present Lease or entering into a New Lease with the landlord."

To that end, Mehta wrote to Leonardi, informing her about Patel's interest in taking over the store and asking what needed to be done to either assign the lease to Patel or form a new lease between Patel and Leonardi.  Leonardi responded by sending a rental application for Patel which was used to check his credit, a necessary first step for either the assignment of the existing lease or the formation of a new one.  After Leonardi determined that Patel's credit rating was acceptable, she wrote to Patel, asking him to get estimates on several repairs of the store, including the installation of new flooring, an upgrade of the electrical service panel, and a renovation of the bathroom.  In that letter, Leonardi explained that she would meet with Patel only after the estimates were completed.

Patel forwarded this letter to Mehta, which touched off a flurry of letters from Mehta to Leonardi. In his first letter, Mehta noted that all the renovations mentioned in Leonardi's letter were her responsibility. Mehta asked that Leonardi "withdraw these unwarranted conditions, and enter into a new lease with Mr. Patel . . . ." Failing that, Mehta stated that he would assign the lease to Patel. According to the existing lease, any assignment had to be approved by Leonardi, but with the caveat that she could not unreasonably withhold her approval, a fact that Mehta emphasized in his letter. Less than a week later, after Mehta heard nothing from Leonardi, he wrote another letter reiterating that her request for the estimates was unreasonable and asking for an opportunity to "sit down and try to work this matter out . . . ." Just a few days after that, Mehta drafted a lease assignment agreement, based on the one he signed when he first bought the store, and sent it to Leonardi. Mehta signed the agreement but Patel did not, even though there was a blank space at the end of the agreement for his signature. Leonardi met the proposed agreement with silence. Mehta then wrote again, notifying Leonardi that he intended to sue her because he construed her silence as an unreasonable refusal to consent to the assignment of the lease.

Meanwhile, Mehta and Patel worked together to get estimates on the repairs. Just a couple of days after Mehta warned that he was going to file suit, Patel wrote to Leonardi offering to enter into a new lease with her. In that letter, Patel stated that despite his belief that Mehta had properly maintained the store, he would chip in to make some of the improvements Leonardi identified. However, in exchange Patel wanted a three-month abatement on the rent and a new, longer lease, with a cap on rent increases, to ensure that he could recoup the money he would invest to fix up the store. At the end of the letter, he reiterated that his offer was "conditioned upon the execution of a new store lease . . . ." Mehta chimed in a few days later, urging Leonardi to execute a new lease with Patel. Leonardi, unsatisfied with this offer, did not respond. Finally, Patel, through a letter written by his attorney, called off the deal with Mehta. In that letter, Patel's attorney reiterated that the asset purchase agreement was "contingent upon my client being able to enter into a new lease," and concluded that the deal was "null and void" because Patel could not obtain one. Unsurprisingly, Mehta and Leonardi's relationship continued to break down after the deal fell through, and eventually the lease was terminated.

True to his word, Mehta filed suit against Leonardi. At trial, Patel testified that he would be unwilling to spend $120,000 to take over Mehta's store if Leonardi could walk away from the lease in 60 days. He emphasized that his letter to Leonardi, the only one he wrote to her, was an offer for a new lease, and was not an agreement to the assignment of the existing lease. Leonardi confirmed that she received no offer from Patel to assume the lease. Mehta, however, testified that Patel was willing to take over the lease, even with the 60-day provision, although, when challenged, Mehta backed down and testified instead that he didn't know if Patel would have been willing to do so. In the end, the jury found that Leonardi's refusal to consent to the assignment breached the lease agreement with Mehta, although it concluded that her refusal did not amount to national origin discrimination. Leonardi then filed a motion for judgment as a matter of law, which the district court granted. The court acknowledged that Mehta presented evidence that Patel was ready and willing to purchase the store and enter into a new lease but granted the motion because it found nothing to suggest that Patel offered to assume Mehta's existing lease.

Under Illinois law, a landlord cannot unreasonably withhold her consent to a sublease or assignment. *Golf Mgmt. Co. v. Evening Tides Waterbeds, Inc.*, 572 N.E.2d 1000, 1003 (Ill. App. Ct. 1991); *Jack Frost Sales, Inc. v. Harris Trust & Sav. Bank*, 433 N.E.2d 941, 949 (Ill. App. Ct. 1982). But before a landlord can be held liable for withholding her consent, the tenant must prove that he "tendered a subtenant who was ready, willing, and able to take over the lease." *Golf Mgmt. Co.*, 572 N.E.2d at 1003. Because the district court granted Leonardi's motion for judgment as a matter of law, we must determine whether any reasonable jury could have sided with Mehta. In undertaking this review, we draw all reasonable inferences in Mehta's favor and refrain from reweighing the evidence or making our own credibility determinations. *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 578-79 (7th Cir. 2003).

Mehta's biggest hurdle is producing evidence that Patel offered to take over the lease despite the provision that allowed Leonardi to cancel it upon giving 60 days written notice. It's hard to imagine that any buyer would be willing to accept a lease that included this term. Businesses require at least some continuity and stability, and the 60-day provision undermines both. It would be risky, to say the least, to invest money to buy a store and take over a lease if the landlord could force the purchaser to pack everything up and move just two months later. From a practical standpoint, the 60-day cancellation provision made Mehta's lease unassignable.

As it turns out, the 60-day cancellation provision proved to be a killer. Patel, the only potential subleasee proposed by Mehta, testified that he would be unwilling to spend $120,000 to acquire the store if the landlord could walk away from the lease upon 60 days notice. Patel-- in his only communication with Leonardi, other than submitting the rental application--made an offer for a new lease, not an assignment of the existing one. And when the negotiations were unsuccessful, Patel's attorney wrote a letter to Mehta declaring the deal dead because his attempts to get a new lease had failed. The letter made no mention of any attempts to take over Mehta's existing lease. Mehta tendered a prospective tenant, not a prospective subleasee.

The closest Mehta comes to providing evidence for his claim is the lease assignment agreement he sent to Leonardi. The problem is that the agreement, though signed by Mehta, was not signed by Patel. While the agreement is evidence that Mehta wanted to assign the lease, it says nothing about whether Patel wanted to take it over. Mehta testified that Patel was willing to sign the agreement (although, as we noted, Mehta backed away from this assertion), but even if that was the case, how was Leonardi to know? There is no evidence in the record that Patel told Leonardi--in person, in writing, or over the phone--that he was willing to assume the lease. Because Patel never asked for an assignment, Leonardi cannot be liable for refusing to consent to one. *See Bismarck Hotel Co. v. Sutherland*, 529 N.E.2d 1091, 1096-97 (Ill. App. Ct. 1st Dist. 1988) (noting that a party must be able to identify a "specific prospective sublessee" lost by the landlord's prohibition on subletting). What Patel did ask for was a new lease, and Leonardi was under no obligation to enter into a new agreement with Patel.

Mehta maintains that the absence of Patel's signature is insignificant because the lease assignment agreement was sent to Leonardi only after she repeatedly refused Mehta's written requests for the assignment. According to Mehta, there was no point in asking Patel to sign the document until Leonardi agreed to the assignment. This argument is a stretch. As an initial

matter, Mehta's letters were not unequivocal demands for Leonardi to agree to a lease assignment. In the first letter, Mehta inquires about "what needs to be done regarding [Leonardi's] acceptance of the assignment of the current lease or an execution of a new lease agreement with the buyer." This letter, which just gets the negotiations started, even floats the option of a new lease. Similarly, the two other letters Mehta sent to Leonardi contemplate both the potential assignment of the lease or the negotiation of a new lease and asks that the parties "sit down and try to work this matter out." More importantly, this argument suffers from the same flaw as Mehta's first one. Mehta and Patel are separate parties in the lease negotiations; Patel was represented by his own attorney, and, as the prospective purchaser of Mehta's business, had interests that were not necessarily aligned with Mehta's. Mehta's letters, which show that he wanted to get out of the lease, aren't evidence that Patel offered to take the lease over as written.

Mehta tries to avoid these problems by contending that the 60-day cancellation provision could have been negotiated out of the lease. The Illinois courts have held that a prospective subtenant can be found willing to take over a lease, even if in his offer to take an assignment he seeks to negotiate an additional term, like an option to renew the lease. *Golf Mgmt. Co.*, 572 N.E.2d at 1004. Had Patel offered to assume the assignment, contingent on the removal of the 60-day provision, Mehta may have had a case. But Patel made no such offer. Because the evidence shows that Patel asked for a new lease, not an assignment, Mehta's appeal fails.

Accordingly, we AFFIRM the judgment of the district court.