**MABEL DALE INGVOLDSTAD by and through her Attorney-in-Fact, DALE I. MEYER, Plaintiff**

**v.**

**KINGS WHARF ISLAND ENTERPRISES, INC., Defendant**

**and**

**CHASE MANHATTAN BANK, N.A., Intervenor**

Civil No. 1983/36

District Court of the Virgin Islands

Div. of St. Croix

August 2, 1983

MARIA TANKENSON HODGE, ESQ., St. Thomas, V.I., *for plaintiff*

JEAN-ROBERT ALFRED, ESQ., Christiansted, St. Croix, V.I., *for defendant*

JOHN F. JAMES, ESQ., Christiansted, St. Croix, V.I., *for intervenor*

O'BRIEN, *Judge*

## MEMORANDUM OPINION AND ORDER

The plaintiff landlord ("Ingvoldstad") seeks in this action the forfeiture and termination of the amended lease held by the defendant

tenant ("KWIE") on the premises known as the King Christian Hotel in Christiansted. She asserts various breaches of the amended lease agreement and claims that they are of such a serious nature that they entitle her to possession of the hotel property, which has been in the hands of KWIE and its predecessor in interest under the amended lease in question and its antecedents since the mid-1960's. The draconian relief of forfeiture and termination will not be granted. However, the Court will fashion relief aimed at curing present and future defaults by the tenant in performance of required terms and conditions.[1]

## I. FACTUAL BACKGROUND

This is not the first time that Ingvoldstad has sought termination of the amended lease under which KWIE is now the tenant. The amended lease is for a period of thirty years ending in July 1996, with a ten-year renewal option in favor of the tenant. At the present time, the annual rental is $19,800, increasing to $24,780 a year in 1986. These payments are "net, net" to the landlord, i.e., the tenant is responsible for all taxes and other expenses.

Suffice it to say that various tenants herein, have expended considerable sums, in the seven figures, on the property which is an operating hotel with a quality restaurant and other sub-tenants. It has been vastly enhanced in value since the 1960's, all through efforts of tenants.

On the first occasion in which the plaintiff sought termination of the lease, that relief was refused. deMouy v. Ingvoldstad, 1979 St. T. & St. J. Supp. 188 (May 22, 1979), although Chief Judge Christian in his lengthy opinion required certain action to be taken by the tenant.[2]

There is no question in the Court's mind that from the first instance to the present, the landlord has sought to regain possession of the property because the landlord believes that the lease provides little or no economic benefit to herself. Such is her attitude that on November 3, 1980, she filed in this Court an action against the attorneys who represented the landlord in the creation of the lease which is the subject of this litigation. Ingvoldstad v. Estate of Warren Young, et al., 18 V.I. 346 (D.V.I. 1981). (The ultimate result

---

[1] The intervenor entered this action to protect its interest as the mortgagee of the property subject to the lease.

[2] Though a St. Croix case, it is reported in the St. Thomas-St. John Supplement under the practice at that time of reporting the case where the judge was resident.

in that case, a dismissal with prejudice, is reported at 95 F.R.D. 79.) In her complaint in that case, the plaintiff alleged that the leases "were negotiated with terms substantially disadvantageous" to the landlord, and that she has suffered damages consisting of the "loss of the market value of her interest in said real property and loss of rentals and profits which otherwise would have been realized in the amount of $2,000,000."

Still retaining that viewpoint, the plaintiff again seeks termination of the lease in the case herein. She alleges that since 1979 the tenant is once again in default under the terms of the lease as to the amount of insurance coverage, the obligation to repair and maintain the premises, the obligation to provide the landlord with certain receipts for expenditures, and the obligation to properly apply to various governmental agencies for permits where appropriate. There are other claims of default as well. None of them includes nonpayment of rent.

Supporting the Court's view that all of the efforts of the plaintiff are directed at regaining control of the property she believes was too cheaply leased is the fact she has not availed herself of any alternate remedies available to her under Restatement of Property (Second), Landlord and Tenant, Section 13.1. These alternate remedies include the recovery of damages for tenant's nonperformance, and the recovery of the reasonable cost of performing the tenant's promise. As stated, her interest is less in holding the tenant's "feet to the fire" of performance, than in extinguishing all of the tenant's rights.

Since the amended lease provided in Paragraph 27 thereof for binding arbitration, the Court ordered a stay of proceedings herein, and submitted the matter to arbitration by a panel of three arbitrators selected in accordance with the amended lease. The arbitrators were directed to review each and every claim of default and make findings of fact as to each claim, reserving to the Court the ultimate issue whether any default warranted termination of the lease.

The arbitrators took evidence for several days, and on May 17, 1983, their report was filed with the Court. Synthesized for the purposes of this portion of the opinion, but expanded upon later herein, the arbitrators' findings were:

(1) The insurance coverage on the property at that time did not meet the requirements of the amended lease.

(2) There was inadequate continuing maintenance of the property as required under the amended lease, although the structural integrity of the building has not been impaired, the maintenance required being "superficial" in nature. The existence of a present

627

danger of structural damage to the building from moisture resulting from the chill water system was not established.

(3) The landlord waived any claims for default arising out of the requirement that the tenant keep the landlord informed as to plans, specifications, etc.

(4) The tenant failed to furnish the landlord with cost information respecting repairs, renovation or new construction. (The tenant reports to the Court that such information has now been furnished to the landlord.)

(5) The tenant failed to obtain governmental permits for reconstruction of the windows fronting King St., and for extension of the pier, but failure thereof has not resulted in any action being taken by such governmental agencies to nullify the tenant's own action.

After the receipt of the arbitrators' findings, the parties were given an opportunity to brief the question of what result should issue from those findings.

## II. APPLICABLE LAW

 A discussion of the legal factors in this case returns us to basic principles of the law of equity. The landlord seeks nothing less than the forfeiture of the lease by the tenant, and the landlord's own possession of the property. A basic principle is that equity abhors a forfeiture. Jones v. New York Guaranty & Ind. Co., 101 U.S. 622, 628 (1879). Applying that principle to the species of case before us at present, it has uniformly been held that courts, on the basis of equity, are vested with the discretion under some circumstances to decline to grant a lessor cancellation of a lease, although such right appears available to him. Hebert v. Brasseaux, 399 So.2d 778 (La. 1981). Likewise, in Food Pantry v. Waikiki Business Plaza, Inc., 575 P.2d 869, 875–876, (Haw. 1978), the Court recalled the following rule of equity:

> And in the exercise of its general equity jurisdiction over forfeitures and penalties, it may afford relief against forfeiture for the breach of a covenant in a lease . . . . (Citations omitted.)
> . . . Where the lessee's breach has not been due to gross negligence, or to persistent and willful conduct on his part, and the lessor can reasonably and adequately be compensated for his injury, courts in equity will generally grant relief. This matter is addressed to the sound discretion of the trial court acting in accordance with established principles of equity, and its determinations will not be set aside unless manifestly against the clear weight of the evidence . . . . (Citations omitted.)

628

Put another way, of course, forfeitures are not favored in equity, and unless the penalty is fairly proportionate to damages suffered by the breach, relief will be granted to prevent forfeiture when the lessor can, by compensation or otherwise, be placed in the same condition as if the breach had not occurred. "The underlying principle is that a court of equity is a court of conscience and nothing will be permitted within its jurisdiction which is unconscionable." Hasden v. McGinnis, 387 S.W.2d 631, 633 (Tenn. 1964).

The duty of this court then is to apply these principles to the situation at hand.

## III. DISCUSSION

For purposes of discussion, we will take in turn each of the findings of the arbitrators which indicate a failure to comply with the amended lease.

### A. *Insurance Coverage*

The tenant is required by the amended lease to keep the premises insured for fire and extended coverage to an amount equal to eighty percent of the replacement costs of the premises. In the previous District Court proceeding between these parties involving this lease, the full value of the premises in 1978 was found to be $1,492,000, of which eighty percent would be $1,194,000. The tenant provided a policy of insurance for the $1,194,000. But this coverage has not been increased to account for the increase in construction costs in the territory, which the parties stipulated at the arbitration hearing was not less than forty percent since 1978. Such an increase would then reflect a present day full value of $2,088,800 of which eighty percent would be $1,671,040.

Other partially overlapping coverage had been provided by a subtenant, but that fact does not alter the conclusion that the insurance coverage in 1983 was found by the arbitrators to be deficient.

Has the landlord been damaged by the inadequate insurance coverage? Thankfully, and gratefully, no. How can the landlord be placed "in the same condition as if no breach had occurred?" Hasden, supra. The Court finds that the insurance coverage must be such that it will automatically take into account future increases in replacement costs. This can best be accomplished by adopting the proposal included in the letter from Young-Clark Insurance, Ltd. of May 26, 1983 to the tenant, which was attached to defendant's memorandum filed with the Court on June 1, 1983. Such coverage would meet the requirements of the amended lease and cure the breach before any damage is done.

■ There would not, then, be any reason for forfeiture for inadequacy of insurance.

### B. *Repairs and Maintenance*

The arbitrators found that the program of ongoing repairs and maintenance by the tenant was inadequate. It does not exhibit "top quality" as required in Paragraph 18 of the amended lease. The inadequacy particularly involves the condition of the gutters and shutters, penetration of the building walls, and routine painting. The arbitrators stressed that this condition does not impair the structural integrity of the building, being "superficial in nature".

The arbitrators also inquired into the chill water system which had involved so much of Judge Christian's time in his May 22, 1979, opinion in the earlier case. But they likewise did not find any structural damage by reason of the moisture which accumulates. This, of course, does not free the tenant of responsibility for all repairs associated with this moisture accumulation, as well as the other repairs and routine maintenance mentioned above.

Has the landlord been damaged by this failure to repair and maintain the premises adequately? Certainly insofar as it would, if permitted to continue, cause severe deterioration to the premises and its consequent value, the landlord is damaged. To date, according to the arbitrators, the evidence of structural damage is lacking. How then, can we fashion relief for the landlord short of forfeiture?

The Court will direct the tenant to prepare and implement a comprehensive program of repair and maintenance. The preparation of that written program shall be completed not later than thirty days from the date of this opinion. Its implementation shall commence not later than sixty days from the date of this opinion. A copy of the program of repair and maintenance shall be served on the landlord.

Since paragraph 25 of the amended lease gives the landlord the right of entry to inspect the premises, the landlord will be in the position to ascertain the degree of compliance with the lease in these respects. If, in the landlord's view, there is less than full compliance, the landlord will have available the right of arbitration to further determine whether in fact there is full compliance. Repeated failure to comply with the repair and maintenance conditions of the lease could ultimately deprive the tenant of the equity protection of this court, and lead to the forfeiture so ardently sought by the landlord.

### C. *Cost Information and Receipted Bills*

Interlocked with the duty to repair and maintain the premises is

the right of the landlord to review information developed by the tenant in conjunction with that obligation. The arbitrators found that the tenant had not complied with the requirement to keep the landlord informed. Tenant, after the arbitrators' findings had been filed, communicated such information to the landlord. Despite the strong argument of landlord's counsel that this has severely damaged the landlord, the Court cannot find this to be the case.

■ Certainly, as part of the program to be developed under the repair and maintenance requirements discussed above, the tenant can include an acceptable plan to meet the duty to inform. Again, failure to do so could deprive the tenant of the protection of a court of equity, resulting in the termination of the lease.

D. *Obtaining Necessary Permits*

The arbitrators found that no permits had been applied for or issued in connection with the reconstruction of the windows fronting King St., nor were permits applied for or issued in connection with work on the pier. It appears that with respect to the work on the pier, it was treated simply as the repair of an existing damaged structure by the Coastal Zone Management Office of the Virgin Islands Department of Conservation and Cultural Affairs. It is hard to imagine the Army Corps of Engineers bringing an action regarding the work performed on that pier. Certainly it has not indicated any plan to contest the pier expansion.

As to the window reconstruction on King St., various officials of the Virgin Islands government have been aware of the reconstruction for an extended period of time, and they have not challenged the result. One or more of them testified at the arbitration hearing, and there is no indication of any intent to contest the window reconstruction.

Must the Court direct the tenant to return the pier to its original size, and return the windows to their original shape and condition? Hardly. The landlord has not been damaged by the tenant's action, notwithstanding the violation of the amended lease's terms. If in the future any governmental entity challenges these charges, the onus will fall on the tenant. If the official court records are clear on one thing, it is that the landlord was not part of the decision to take such action. The landlord enjoys the right of indemnity.

■ The violations in this regard are not such as should trigger a forfeiture of the lease.

## CONCLUSION

The Court finds that to permit the forfeiture and termination of the amended lease would result in unconscionable financial loss to the tenant and a concomitant unconscionable financial gain to the landlord. There is no issue here of nonpayment of rent or taxes. It is clear that the property has been substantially increased in value by efforts of various tenants. Indeed, the expenditure of substantial funds by the tenants for improvements to the property was contemplated in the amended lease. A hotel and shops exist where once there were none. A reputable restaurant affiliated with a national chain exists on the property, further enhancing its value. The tenant has survived and operated in the face of the near depression which confronts St. Croix's hotel industry. The situation herein is much akin to that described in Tollius v. Dutch Inns of America, Inc., 244 So.2d 467, 472–473 (Fla. 1970). And like that court, we close by adopting the following principle enunciated in 27 Am.Jur.2d, Equity § 140, page 675:

> . . . Where the purpose or object of the suit is to accomplish something which will produce inequitable or unconscionable result, equity will not grant affirmative relief.

For the reasons cited herein, we will deny the landlord the forfeiture and termination of the lease. Rather, an order will enter which will grant relief of the nature discussed herein, admittedly short of forfeiture, but within the guidelines of the equitable principles spelled out in this opinion.

## JUDGMENT

This matter is before the Court for disposition, the arbitrators having filed their findings of fact. The Court having filed its Memorandum Opinion of even date herewith, and the premises considered, now therefore it is

ORDERED, ADJUDGED AND DECREED:

1. THAT plaintiff's request for termination of the lease be and the same is hereby DENIED.

2. THAT the defendant acquire insurance coverage of an amount equal to eighty percent of the present replacement value of the property, with an annual inflation increase factor, within ten days of the date hereof.

3. THAT the defendant prepare a program of comprehensive repair and maintenance within thirty days of the date hereof, and implement such program within sixty days of the date hereof.

4. THAT the plaintiff file an application for an award of attorneys' fees within ten days of the date hereof, or be barred therefrom.