**THE LODGE, INC., Plaintiff**

v.

**CARAVELLE RESTAURANT, INC., THOMAS DOWD, JR.,
and THE SMALL BUSINESS ADMINISTRATION,
Defendants**

Civil No. 997/1982

Territorial Court of the Virgin Islands

Div. of St. Croix

March 2, 1984

RICHARD D. KEELING, ESQ., Christiansted, St. Croix, V.I., *for plaintiff*

JOHN B. NICHOLS, ESQ. (NICHOLS AND NEWMAN), Christiansted, St. Croix, V.I., *for defendant Caravelle Restaurant, Inc.*

JOHN F. JAMES, ESQ. (JAMES AND RESNICK), Christiansted, St. Croix, V.I., *for defendant Thomas Dowd, Jr.*

PETERSEN, *Judge*

## MEMORANDUM OPINION

This is an action for eviction and damages based upon breach of lease. The plaintiff alleges that the defendants breached the terms

of the lease by subletting the premises to a third party without the landlord's consent and by failing to keep the premises in good repair. The defendants deny that they breached the lease and by cross-claim seek damages, alleging that the plaintiff unreasonably withheld its consent to the proposed sublease and/or assignment to the third party. The defendants also request that the Court determine the respective rights, obligations and duties of the parties under the maintenance provision of the lease. This matter came before the Court in a nonjury trial on June 1 and 2, 1983.

## FACTS

On September 30, 1973, plaintiff, The Lodge, Inc. (hereinafter referred to as "the Lodge"), entered into a written lease agreement with the defendants, Caravelle Restaurant, Inc. (hereinafter referred to as "the Caravelle"), and Thomas E. Dowd, Jr., as guarantor, whereby the defendants leased from the plaintiff the property on 43A Queen Cross Street in Christiansted with the improvement thereon known as the Lodge Hotel. The lease was for ten (10) years, with an option to renew for two consecutive five-year periods. The agreement also contained an option to purchase during the first three years of the lease.

Early in January 1982, Joseph and Marion Ambroselli moved from Vermont to St. Croix and presented to the Caravelle an offer to sublease the Lodge Hotel premises, subject to the consent of the Lodge. While negotiations were underway, the Ambroselli's moved into the Lodge Hotel in February 1982, and assumed managerial functions in March. On March 17, 1982, Attorney Elizabeth Allen, a Corporate Director of the Lodge, then residing in Maine, received a copy of the proposed sublease between the Ambroselli's and the Caravelle. After a series of correspondence involving Ms. Allen, the Caravelle and the Ambroselli's, Ms. Allen informed the Caravelle that pursuant to paragraph eleven of their lease, the Lodge could not consent to the proposed sublease between the Ambroselli's and the Caravelle.

Continuing negotiations regarding the proposed sublease revealed that certain maintenance repairs were alleged to be necessary to currently maintain the Lodge Hotel in "good repair." Some repairs were made, but a dispute arose in July 1982, concerning whether the landlord or the tenant was responsible for the structural maintenance of the premises. In an earlier development bearing on the structural maintenance issue, Thomas Dowd, acting for the Caravelle, applied for and received an emergency disaster relief loan

from the Small Business Administration (hereinafter referred to as "SBA"), with the Lodge consenting to a conditional assignment of the Caravelle's lease as security for the loan.

Persistent disagreement between the Lodge and the Caravelle over maintenance responsibilities and problems with rent payments purportedly led the Lodge to agree in July 1982, to conditionally consent to the Ambroselli's sublease of the Lodge Hotel if the Caravelle would undertake, at its own expense, to properly repair the allegedly unsatisfactory condition of the premises. When the parties failed to reach a satisfactory agreement, the Ambroselli's withdrew their offer to sublease and vacated the Lodge Hotel on September 6, 1982. Alleging violations of the lease by the Caravelle by subletting without consent, failure to pay rent and failure to make necessary repairs, the Lodge gave the Caravelle notice to vacate the Lodge Hotel on September 13, 1982.

## DISCUSSION

I. *Withholding of Consent*

Paragraph eleven (11) of the lease between the Lodge and the Caravelle provides that

> ASSIGNMENT—SUBLEASE: This lease may not be assigned nor the premises sublet nor shall the controlling interest in LESSEE Corporation be sold without the consent of the LESSOR which consent shall not be unreasonably withheld, provided that the proposed assignee or sub-lessee is of substantially the same character and financial and business abilities as LESSEE and provided further that LESSEE remains and continues to be responsible hereunder and that Thomas E. Dowd, Jr., as guarantor also consents thereto and is not released from his guarantee.

The plaintiff contends that the Caravelle sublet the Lodge Hotel to the Ambroselli's without its required consent from February to September 1982. As a consequence of this alleged breach and for failure to pay back rent, the Lodge commenced eviction proceedings. The Caravelle denied that the Lodge Hotel was formally sublet and counterclaimed that it suffered substantial financial loss as a result of the Lodge's unreasonable withholding of consent.

In the absence of local law to the contrary, the rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, govern the rules of decision of the courts of the Virgin Islands. 1 V.I.C. § 4 (1967); Co-Build Companies,

Inc. v. Virgin Islands Refinery Corp., 15 V.I. 528, 533 (3d Cir. 1978); Allaire v. United States Trust Co. of N.Y., 478 F.Supp. 826, 827 (D. St. Croix 1979) (property law dispute). The Restatement (Second) of Property Section 15.2 comment e (1977) provides that "[a] restraint on alienation will be narrowly construed to keep the constraint as limited *as is consistent with the language describing the constraint"* (emphasis added). Bearing this admonition in mind, the evidence shows that the Lodge and the Caravelle freely negotiated and specified the relevant criteria for the lessor to reasonably consent to a proposed sublease and/or assignment.

 The express provision in the lease that the lessor shall not withhold consent to a proposed sublease and/or transfer unreasonably is a covenant by the lessor. Restatement (Second) of Property Section 15.2 comment c. Nevertheless, a condition precedent to a lessor's duty to consent to a sublease or assignment when such consent is not to be unreasonably withheld is that the lessee tender to the lessor a suitable proposed subtenant or assignee. Jack Frost Sales, Inc. v. Harris Trust and Savings Bank, 104 Ill. App. 3d 933, 433 N.E.2d 941, 949 (Ill. App. Ct. 1982). The burden of proving the unreasonableness of a landlord's withholding of consent is on the party alleging the unreasonableness. Funk v. Funk, 102 Idaho 521, 633 P.2d 586, 589 (Idaho 1981); Haack v. Great Atlantic and Pacific Tea Co., 603 S.W.2d 645, 649 (Mo. Ct. App. 1980).

██ ██ The primary criteria set forth in paragraph eleven of the lease is that the "proposed assignee or sublessee is of substantially the same character and financial and business abilities" as the lessee. It is widely recognized that one of the most important factors in determining whether a proposed commercial sublessee or assignee meets "reasonable commercial standards" is his or her financial responsibility. Jack Frost Sales, Inc. v. Harris Trust and Savings Bank, supra, at 950. Moreover, the financial reputation of a tenant is a "particularly understandable" concern of a landlord. Restatement (Second) of Property Section 15.2 comment a.

The evidence reveals that on March 25, 1982, seven days after receiving a proposed sublease between the Caravelle and the Ambroselli's, the Lodge wrote the Caravelle informing them that, inter alia, consent would not be possible without a full disclosure of the financial standing and background of the proposed subtenants, the lawfulness of their purpose, their ability and intent to continue operation of the Lodge Hotel in a manner consistent with the present operation and which will preserve its present value. This

273

requested information is not only consistent with the provisions of paragraph eleven (11) of the lease and with legitimate business concerns, but also with the criteria set forth as relevant to the issue of consent in the Restatement (Second) of Property Section 15.2, Reporter's Notes.[1]

The Caravelle responded by letter dated March 31, 1982, with assurances as to the intended consistent and lawful operation of the Lodge Hotel, with Mr. Dowd's assurance that he would personally inspect the premises on a frequent basis during the pendency of the sublease and with personal financial and biographical statements of the Ambroselli's. After reviewing what it considered to be an incomplete financial statement and the biographical information, the Lodge informed the Caravelle by letter dated April 12, 1982, that sound business prudence required its withholding of consent to the proposed sublease.

Based on the information before it, the Lodge concluded that the Ambroselli's had neither the financial nor the hotel business experience of the present lessee, the Caravelle, and its manager, Thomas Dowd, Jr. While Mr. Dowd was an apparently well respected and well known person in the St. Croix business community with over eleven years' experience in hotel management, plus at least two years' restaurant experience in New Orleans, the Ambroselli's had only approximately two years of experience in managing a hotel in Vermont, a venture which ended in a fire. It was within the business prerogative of the Lodge to be concerned about the fire as $a$ potential source of insurance coverage difficulties along with the more essential lack of comparable hotel management experience. See Fairchild Realty Co. v. Spiegel, 246 N.C. 458, 98 S.E.2d 871, 877 (N.C. 1957). More importantly, while the financial statements lacked the essential details necessary for verification of unsubstantiated assets, such as bank account numbers or bank branches, the Forty Thousand ($40,000.00) Dollars in total assets listed by the Ambroselli's did not compare favorably with those of Mr. Dowd. Although the extent of his assets at the time of the proposed lease is unknown, Mr. Dowd's net worth at the time of trial was approximately eight times that of the Ambroselli's.[2]

---

[1] These criteria are: (a) financial responsibility, (b) the "identity" or "business character" of the transferee, i.e., his suitability for the particular building, (c) the legality of the proposed use, and (d) the nature of the occupancy. American Book Co., v. Yeshiva University Development Foundation, Inc., 59 Misc. 2d 31, 297 N.Y.S.2d 156 (N.Y. Sup. Ct. 1969).

[2] Although this Court construes the language of paragraph eleven (11) of the lease to refer to Mr. Dowd's financial and business status at the time of a proposed sub-

■■ The burden of furnishing a lessor with sufficient information to determine whether or not to consent to a sublease and/or assignment of a lease is on the lessee. Fairchild Realty Co. v. Spiegel, supra, at 877; Doca v. Delfakis, 130 Ariz. 470, 636 P.2d 1252, 1253 (Ariz. Ct. App. 1981). When a landlord is provided with unsatisfactory proof of a transferee's financial responsibility, the landlord's refusal to consent to a transfer is not unreasonable. Robinson v. Weitz, 171 Conn. 545, 370 A.2d 1066, 1069 (Conn. 1976); Jack Frost Sales v. Harris Trust and Savings Bank, supra, at 951; Johnson v. Jaquith, 189 So. 2d 827, 829 (Fla. Dist. Ct. App. 1966). Despite personal communications between Ms. Allen and Mrs. Ambroselli, the record shows that notwithstanding the defendants' allegation to the contrary in a letter dated August 19, 1982, the legitimate requests of the Lodge for supplementary financial information were not satisfied in a timely manner. In fact, Mrs. Ambroselli failed to supplement her financial statement for reasons of privacy.

■ After reviewing all of the credible evidence, this Court holds that the Lodge acted in accordance with the specific criteria set forth in paragraph eleven (11) of the lease and with reasonable business prudence in withholding consent to the proposed sublease. The fact that the Lodge subsequently informed the Caravelle in July 1982, that it would conditionally consent to the sublease if certain maintenance disputes were resolved between the Lodge, the Caravelle and the Ambroselli's has no bearing on this Court's holding for two reasons. First, the Ambroselli's were unwilling to assume the sublease unless the maintenance repairs were completed to their satisfaction. Second, the maintenance dispute was not resolved by the time the Ambroselli's withdrew their offer on September 6, 1982. Accordingly, the defendants counterclaim for damages resulting from the allegedly unreasonable withholding of consent to the sublease and/or assignment is DISMISSED.

■ The plaintiff alleges that the Caravelle breached the default provisions of paragraph twenty (20) of the lease by subletting the Lodge Hotel to the Ambroselli's from February to September 6, 1982. In support of its claim, the Lodge contends that the Caravelle

lease, even assuming as Defense counsel suggests, that the relevant period is the time when the lease was signed in 1973, the Court notes that Mr. Dowd's net worth was Seventy-Seven Thousand ($77,000.00) Dollars in 1973, in contrast to the Ambroselli's Forty Thousand ($40,000.00) Dollars and that the Lodge had observed Mr. Dowd's business ability firsthand during the two years he managed the Lodge Hotel from 1971–1973.

referred to the Ambroselli's as subtenants, that the Caravelle attempted to charge monthly rent to the Ambroselli's during their period of sole management of the Lodge Hotel and that the Caravelle retained in escrow a security deposit paid by the Ambroselli's on the proposed sublease. The plaintiff has failed to prove these allegations by a preponderance of the evidence. The evidence reveals that sections 2(e) and 3(d) of the proposed sublease between the Ambroselli's and the Caravelle specifically provided as a condition precedent to subtenancy that the consent of the lessor be obtained by the Caravelle. Such consent was, of course, never obtained. Furthermore, the Ambroselli's considered themselves to be nothing more than "guest custodians" as part of a mutually convenient relationship pending the signing of the sublease. Despite the fact that the Ambroselli's did occupy and manage the Lodge Hotel from February to September 6, 1982, the Court holds that the evidence is insufficient to support a finding that the Ambroselli's were legal subtenants. Moreover, the Court finds that the plaintiff has failed to prove by a preponderance of the evidence that rent was paid to the Caravelle by the Ambroselli's.

 It is said that equity abhors a forfeiture. Ingvoldstad v. Kings Wharf Island Enterprises and Chase Manhattan Bank, 19 V.I. 624, 628 (D.V.I. 1983) (citing Jones v. New York Guaranty and Ind. Co., 101 U.S. 622, 628 (1879)). Accordingly, a court of equity may decline where warranted to grant a lessor cancellation of a lease, even if such right appears available to him. Ingvoldstad v. Kings Wharf Island Enterprises and Chase Manhattan Bank, supra at 628. While the nature of the Ambroselli's occupancy of the Lodge Hotel was unusual, the Court finds that there has been a failure of the requisite proof by a preponderance of the evidence to support a finding of subtenancy. Consequently, that portion of the plaintiff's claim seeking eviction for breach of the subletting provisions of the lease must be DENIED.

II. *Responsibility for Maintenance and Structural Repairs Under the Lease*

The Lodge contends that the duty of making structural repairs under the lease rests with the Caravelle. Extensive repairs were made by the Caravelle during the nine and one-half years of the lease, many of which are purported by the Lodge to have been structural. Citing substantial damage to the roof, walls, stairway and exterior of the Lodge Hotel, the Lodge maintains that these repairs were inadequately performed and that therefore the Caravelle

breached its lease promise to maintain the premises, improvements, furniture, fixtures and effects in good repair. The Lodge alleges that damages amounting to Twenty-Five Thousand ($25,000.00) Dollars are required to restore the premises in good repair. A fair portion of the past and allegedly current damage is due to water leakage and termite infestation. The Caravelle maintains that despite its belief that the duty of structural repair rested with the Lodge, it performed competent structural repairs in the past as a matter of business necessity. The Court must now determine upon which party the burden of effecting structural repairs rests and whether or not the lessor-Caravelle has breached its duty to maintain the premises in good repair.

 Paragraph nine (9) of the lease provides, in relevant part:

MAINTENANCE: LESSEE shall have complete responsibility for the maintenance and repair of the premises and the improvements, furniture, fixtures, linens and effects located thereupon, including the day-to-day maintenance and upkeep and replacement of any obsolete or deteriorated improvements, furniture, fixtures, linens and effects. LESSEE shall at all times maintain the premises, improvements, furniture, fixtures and effects in good repair and in a neat, clean and orderly condition and further agrees that it will not remove or permit the removal thereof from the premises. Upon the termination of this lease, LESSEE shall surrender the premises, improvements, furniture, fixtures, linens and effects and any replacements thereto to LESSOR in such a condition as reflects only ordinary wear and tear from prudent and careful use. . . .

The Restatement (Second) of Property Section 15.6 states that

[t]he parties to a lease may agree to increase or decrease what would otherwise be the obligations of the landlord with respect to the condition of the leased property . . . and those agreements are valid and binding on the parties to the lease unless they are unenforceable in whole or in part because they are unconscionable or significantly against public policy.

The words and conduct of the parties are to be interpreted in light of all the circumstances and when the drafting party is the landlord, all ambiguities are to be construed against her. Restatement (Second) of Property Section 13.1, note 2; Bogan v. Postlewait, 130 Ill. App. 2d 729, 265 N.E.2d 195, 197 (Ill. App. Ct. 1970).

 In most leases which address the question of structural maintenance and repair, the landlord either explicitly retains or relieves itself of structural obligations. Section 5.6 comment d of the Restatement (Second) of Property provides that any decrease in the landlord's obligations in regard to the condition of the leased premises will be strictly construed against the landlord. However, the provisions of paragraph nine (9) of the lease contain no reference to either "structural" maintenance and repair or to "termite" control and repair. Consequently, the operative words to be construed by the Court are "complete responsibility for the maintenance and repair of the premises." It is a general rule of construction that the usual and commonly accepted meaning is to be given to the language of a lease. 49 Am. Jur. 2d Section 945 (1970). See also, Restatement (Second) of Contracts Section 202(3) (1977).

But, what is the usual and commonly accepted meaning of the words "complete responsibility" in this lease? Did the parties intend this language to refer to complete structural and nonstructural maintenance and repair, or to refer to complete day-to-day ordinary maintenance and repair? The Court finds the contract to be ambiguous on the question of maintenance and repair obligations.

Ordinarily, this Court might construe the ambiguities of the lease against the landlord, concluding that the obligations undertaken by the lessee-Caravelle in the lease constitute a general promise to perform all ordinary maintenance reasonably required to keep the premises in good repair during the period of its tenancy, but not to undertake structural repairs on the premises. See Restatement (Second) of Property Section 13.1, Reporters Note 4 at 504–505; Kaufman v. Shoe Corp. of America, 24 Ill. App. 2d 431, 164 N.E.2d 617, 620 (Ill. App. Ct. 1960). See also Jacobi v. Timmers Chevrolet, Inc., 164 Ga. App. 198, 296 S.E.2d 777, 779 (Ga. Ct. App. 1982). Contra, Polack v. Pioche, 35 Cal. 416, 95 Am. Dec. 15 (Cal. 1898) (cited in Restatement (Second) of Property Section 13.1, Reporters Note 4, supra, at 504, as holding that a general promise to repair is binding on the tenant under all circumstances, regardless of the cause or nature of the damage to the property).

 However, the Restatement instructs that the words *and conduct* of the parties are to be considered by the Court when a contract is ambiguous. Restatement (Second) of Contracts Section 202(1); Restatement (Second) of Property, supra, Section 13.1, note 2. Moreover, although Section 202 comment g of the Restatement (Second) of Contracts admonishes that the conduct of the parties

must be considered in light of the terms of the contract and their possible meaning, it notes that the action of the parties is often the strongest evidence of their intent.

> Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement. Restatement (Second) of Contracts Section 202(4).

As the Supreme Court has held, "there is no surer way to find out what the parties meant, then to see what they have done." Brooklyn Life Insurance Co. v. Dutcher, 95 U.S. 269 (1877). See also Capital Bus Co. v. Blue Bird Coach Lines, Inc., 478 F.2d 556, 560 (3d Cir. 1973); Williston on Contracts, 3d Ed. Section 623 at 789–790 (1961). Thus, it is well settled that

> where the language of the contract is ambiguous, the court can look to such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practice in aid of interpretation. United Electrical, Radio and Machine Workers of America v. General Electric Co., 208 F.Supp. 870, 872 (S.D.N.Y. 1962). See also Dow Chemical Co. (V.K.) v. S.S. Giovannella D'Amico, 297 F.Supp. 699, 706 (S.D.N.Y 1969).

If it were possible to determine the plain meaning of the agreement from its language, the practical construction placed upon its terms would not be conclusive. Restatement (Second) of Contracts Section 202 comment g; Railroad Co. v. Trimble, 10 Wall. (U.S.) 367, 19 L.Ed. 948 (cited in Williston on Contracts, supra, at 814. However, the plain meaning of the maintenance provision of the Lodge-Caravelle lease is not clear. On the other hand, the conduct and performance of the parties during the nine and one-half years of the lease show by a preponderance of the evidence that the Caravelle continuously accepted or acquiesced in its performing all structural maintenance and repair of the Lodge Hotel with little objection until 1982.

Thus, by letter of application to the SBA for a flood disaster relief loan dated May 16, 1975, Mr. Dowd, as President of the Caravelle, specifically requested that the recipient of the loan be the Caravelle and not the Lodge, stating that

> [r]esponsibility for maintenance and repair of the demised premises rests exclusively with the Tenant (see pars. 8 and 9 of

279

the lease). In short, for the duration of the lease, Tenant must perform *all physical work* done on the premises. (Emphasis added.)

The purpose of the disaster relief loan was to put a partially new roof on the Lodge Hotel because of damage from the heavy rains. In addition to this written admission, the Caravelle had repair work performed on the roof and bathroom in 1980 after its request that the Lodge pay for repairs to the leaking roof was denied. Again in 1982, the year in which the sublease negotiations with the Ambroselli's were underway, the Caravelle performed extensive structural and nonstructural maintenance and repairs on the Lodge Hotel, including work on the roof, exterior and interior walls and the stairway. According to Mr. Dowd, the Caravelle spent approximately Fifty Thousand ($50,000.00) Dollars on maintenance and repair during the nine and one-half year tenancy. In a letter dated August 19, 1982, concerning negotiations for the proposed subtenancy of the Ambroselli's, Mr. Dowd informed Ms. Allen that "I re-acknowledge my maintenance responsibilities under the lease, responsibilities that have not been changed and which will continue as they have for the past nine years."

The option to purchase provision of the lease, considered in light of the Caravelle's having performed structural maintenance and repair over the years of the lease, is further evidence of the parties' intent that the Caravelle be responsible for structural maintenance and repairs. That the Caravelle made extensive structural improvements at great expense and effort during the first three years of its lease shows that the Caravelle was seriously considering the option to purchase.

In contrast to the structural repair efforts of the Caravelle, at no time during the nine and one-half years of the lease did the Lodge perform structural or nonstructural maintenance on the Lodge Hotel premises. In fact, other than an occasional inspection, the Lodge was an absentee landlord. Furthermore, during the entire period of negotiations in 1982 concerning the proposed sublease of the Ambroselli's, the Lodge remained firm in its conviction that the Caravelle had complete responsibility for all structural maintenance and repair of the Lodge Hotel.

On the basis of the course of conduct and performance of the parties during the entire leasehold period, the Court holds that the

Caravelle is responsible for all structural maintenance and repair of the Lodge Hotel under paragraph nine (9) of the lease.[3]

## DAMAGES

 Having concluded that the Caravelle is responsible for structural and nonstructural maintenance and repair under the lease, the Court finds that the plaintiff's have proved by a preponderance of the evidence that the Caravelle breached its obligation to maintain the premises in good repair. The Ambroselli's repeatedly informed the Caravelle during their guest custodianship of persistent structural maintenance and termite problems. Moreover, despite continuous termite infestation over the years, the Caravelle chose to use Chlordane, an insect control chemical, on the premises rather than the more effective "tenting" method. On the basis of all the expert testimony presented, the Court awards the Lodge Twelve Thousand Six Hundred Ninety-Seven ($12,697.00) Dollars in damages to effect the necessary structural and nonstructural repairs to bring the Lodge Hotel in "good repair."

In accordance with the foregoing opinion, the plaintiff is entitled to recover on its claim for damages.

## JUDGMENT

The premises having been considered and the Court being fully advised, it is hereby

ORDERED that the Plaintiff recover the sum of Twelve Thousand Six Hundred Ninety-Seven ($12,697.00) Dollars as damages; and it is further

ORDERED that Defendants' cross-claim for damages is DENIED.

---

[3] The Court is also of the opinion that termite control is an ordinary day-to-day maintenance responsibility under this lease. Even if it were considered to be structural maintenance, however, the Caravelle would still be responsible for termite fumigation under the maintenance terms of the lease.