VRANAS & ASSOCIATES, INC., Plaintiff-Appellant, v. FAMILY PRIDE FINER FOODS, INC., Defendant and Counterplaintiff-Appellee (Villa Park Plaza Associates, Counterdefendant-Appellant.)

Second District   No. 85—0476

Opinion filed September 24, 1986.—Rehearing denied October 27, 1986.

Geoffrey G. Gilbert, of McBride, Baker & Coles, of Chicago, for appellant.

Patrick J. Williams and Terry A. Ekl, both of Connolly & Ekl, P.C., of Hinsdale, for appellee.

JUSTICE STROUSE delivered the opinion of the court:

Plaintiff brought this action to recover allegedly unpaid rent and expenses arising out of defendant's alleged abandonment of a commercial lease. Defendant counterclaimed for damages arising out of plaintiff's unreasonable refusal to consent to an assignment of the lease to a third party. The court, in a bench trial, found against plaintiff on its complaint and for defendant on its counterclaim for lost profits on the sale of its business. Plaintiff timely appealed.

Villa Park Plaza Associates, through its general partner, Vranas & Associates, Inc. (Vranas), and Family Pride Finer Foods, Inc. (Family Pride), entered into a commercial lease on June 19, 1980. This lease was subsequently extended for a five-year term ending on July 1, 1987.

Family Pride, the lessee, was owned equally by Barry Laub and Charles Marthaler. They formed Family Pride as an Illinois corporation shortly after the lease agreement was executed. Family Pride was initially capitalized by Mr. Laub and Mr. Marthaler with $10,000 in capital stock and with $26,000 in additional loans. The record indicates that Mr. Laub was a certified public accountant, and that he had no grocery store management experience. Mr. Marthaler had considerable experience in the management of grocery stores, although he had been unemployed for at least three months prior to June 1980. Vranas did not require Family Pride to provide any financial statements. The lease did not require that either Mr. Laub or Mr. Marthaler be employed by Family Pride. Personal guarantees had been discussed by the parties, but Mr. Laub or Mr. Marthaler refused to execute any. Family Pride did tender a $5,000 security deposit along with a security interest in all of the fixtures and equipment at the store.

During the summer of 1983 Mr. Laub contacted William Vranas, the property manager for the Villa Park Plaza shopping center, and

advised him that Family Pride was about to be placed on the market for sale. Mr. Laub testified that he and Mr. Marthaler had decided to sell the store because they had established another business closer to their homes.

Two lease provisions relevant to this development were the following:

"*Section 6.01* Tenant shall not assign or encumber its interest in this Lease or sublease the demised premises, or any part thereof, without the written consent of Landlord first had and received, which consent Landlord agrees not to unreasonably withhold or delay, provided such assignment or sublease shall not release Tenant from its obligations under this Lease.

*Section 6.02* If at any time during the term of this Lease, any part or all of the corporate shares shall be transferred by sale, assignment or other disposition so as to result in a change in the present ownership of said corporation, Landlord may serve notice upon Tenant, electing to treat such transfer of corporate shares as a violation of the terms of this Lease, and in the event of failure of Tenant to cure such default within ten days from the date of said notice, Landlord may terminate this Lease and the demised term by giving Tenant sixty days prior written notice of such termination. * * *"

In August 1983 Mr. Laub and Mr. Marthaler received a tender offer from Abel Issa to purchase the business. A sales contract was executed on September 29, 1983, for $45,000 for the fixtures and inventory, plus a $5,000 security deposit which was tendered by Mr. Issa as earnest money. Mr. Laub then contacted Mr. Vranas and informed him that the purchaser was Abel Issa, a businessman who would be forming a new corporation. Mr. Laub suggested, and Mr. Vranas agreed, that Mr. Issa should contact Mr. Vranas directly to discuss the proposed assignment of the lease.

In October 1983 Mr. Issa contacted Mr. Vranas by phone and advised him of his background and qualifications for running a retail business. Mr. Issa had managed stores which had retail sales ranging from $500,000 to $25 million. He had held the position of merchandising manager for Zayre Department Store and Baskin clothing. In addition, he had been a store manager for Bond's clothing store, and an assistant buyer, operations manager and merchandising manager for Carson Pirie Scott. Mr. Vranas gave a favorable response to Mr. Issa's qualifications. Mr. Issa advised Mr. Vranas that the newly formed corporation, Green Valley Finer Foods, Inc. (Green Valley), would be financed with a $200,000 SBA-guaranteed loan from the Union National

Bank of Joliet and he would be investing another $50,000. At the end of the call, Mr. Vranas told Mr. Issa that he saw no reason why he would not get the lease assignment.

Shortly after this, Mr. Issa's attorney, William Washburn, Jr., telephoned Mr. Vranas to discuss the terms of the lease assignment. Mr. Vranas requested that all issues should be placed in writing. Mr. Washburn wrote to Mr. Vranas on October 20, 1983, requesting that the current rent rate be reduced, that the lease term be extended with a renewal option, and that the lien held by the landlord on the store fixtures and equipment be subordinated to the SBA-guaranteed loan. Mr. Vranas responded in writing on November 4, 1983: "Please be advised that ownership has not accepted your offer of a unilateral reduction of the terms in its lease agreement ***."

On December 5, 1983, Mr. Washburn advised Mr. Vranas in writing that the SBA-guaranteed loan had been approved. He also renewed his request that the landlord waive its first lien on the fixtures and equipment and that the lease be assigned to his client without the existing collateral security agreement. Included with this correspondence was a copy of Mr. Issa's financial statement which had been earlier requested. This statement reflected total assets in the amount of $469,238 and total liabilities in the amount of $156,732, leaving a net worth of $312,506. Also included with the correspondence was the SBA's Lender's application for guarantee or participation, reflecting that the SBA and the Union National Bank of Joliet were making a loan in the amount of $200,000 to Green Valley.

On December 7, 1983, Mr. Vranas wrote to Mr. Washburn: "[The] ownership of the Villa Park Plaza will not assign the existing lease to your client without the security agreement as presently attached thereto. This decision was based on your client's lack of equity available as substitute security."

Mr. Washburn contacted the attorney for Family Pride, Charles Stone, and advised him that the transaction would not be able to close prior to the Christmas holidays due to the security-interest problem, but that he would continue to negotiate with the bank in an attempt to eliminate its collateral security requirement. In late December 1983 Mr. Washburn informed Mr. Stone that the SBA had withdrawn its collateral security requirement, that all conditions raised by the lessor had been met, and that Mr. Issa had terminated his employment. He requested that the closing occur as soon as possible.

In early January 1984 Mr. Stone contacted Mr. Vranas and advised him of the imminent closing and the need for the assignment of the lease. Mr. Vranas requested that he be notified when the closing was

to occur. On January 12 Mr. Stone again contacted Mr. Vranas to make final closing arrangements and to discuss the preparation and submission of the lease assignment. Mr. Vranas requested that Mr. Stone prepare the lease assignment which was forwarded to Mr. Vranas for signature on January 13. It was never signed.

On January 17, 1985, Mr. Vranas wrote Mr. Stone and advised him that the lease assignment would not be made unless six new requirements were met. The two requirements which caused the most controversy were the conditions that "[t]he principal of Green Valley Finer Foods, Inc. personally guarantees the performance of the lease," and that "[t]he principals of Family Pride Finer Foods, Inc., namely, Charles Marthaler and Barry Laub personally guarantee the performance of the lease through July 31, 1987." Both Mr. Laub and Mr. Marthaler objected to the personal-guarantee requirement. Mr. Issa testified that he would not personally guarantee the lease.

On January 24, 1984, Mr. Stone notified Mr. Vranas that his request for personal guarantees of the lease was an unreasonable withholding of his consent to the assignment in violation of paragraph 6.01 of their lease. He reminded Mr. Vranas that when the lease was originally executed there had been considerable discussion and negotiation relative to any guarantees and that, at that time, no additional guarantees were imposed. He warned Mr. Vranas that the sale of the business could not be consummated without the assignment and subletting of the premises and that if the sale fell through, his clients would hold Villa Park Plaza Associates liable.

On January 27, 1984, Mr. Washburn wrote to Mr. Stone. This letter informed Mr. Stone that Mr. Issa had terminated his employment in reliance on the closing date of January 24, 1984. He demanded a new closing date within 10 days, conditioned only upon the existing terms of the original lease. He advised Mr. Stone that if a closing date were not set, his client would seek compensatory and punitive damages from the selling party, even though he understood that it was the landlord who was apparently dealing in bad faith. This letter was enclosed in Mr. Stone's correspondence of January 30, 1984, to Mr. Vranas.

On February 2, 1984, Mr. Stone wrote to Mr. Washburn that his clients were ready, willing and able to close the transaction. On February 18, 1984, Family Pride closed its doors. Mr. Laub testified that the reason Family Pride closed its doors and moved out was that "[Family Pride] felt that the landlord had broken the lease. We felt that we no longer had a landlord-tenant relationship." On April 10, 1984, Vranas filed a complaint in forcible entry and detainer. Vranas sought the sum

of $13,723.77, plus costs for the previously accrued but unpaid rent. On April 13, 1984, Family Pride counterclaimed, alleging that Villa Park Plaza Associates' unreasonable refusal to consent to the lease assignment caused Family Pride damages in excess of $70,000.

After a bench trial, the court found that the failure to consent to the assignment of the lease was due to the landlord's attempt to obtain the additional personal guarantees on the lease rather than based on the suitability and acceptability of the proposed assignee. The court concluded that because of the landlord's conduct, Family Pride had no further obligation to pay rent from and after February 1, 1984, and that Family Pride was entitled to recover $45,000 in lost profits, the $5,000 security deposit, and attorney fees of $14,500. Judgment was entered accordingly on May 22, 1985. Vranas and Villa Park Plaza Associates subsequently filed their notice of appeal on June 14, 1985.

Plaintiff first contends that the judgment is against the manifest weight of the evidence. He cites two errors which contributed to the incorrect judgment: (1) the court applied an improper legal standard in assessing the reasonableness of plaintiff's refusal to consent to the assignment by requiring him to prove that his refusal to give his consent was not unreasonable; and (2) the court failed to determine that he was confronted with a lessee who was not "ready, willing and able" to assume the lease.

He contends that the burden at trial is on the tenant to prove that the proposed sublessee was a commercially suitable tenant, and not upon the landlord to prove that his withholding of his consent was not unreasonable. (*Jack Frost Sales, Inc. v. Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 933, 944.) He argues that at trial, the judge misapplied *Jack Frost Sales, Inc.* and shifted the burden to him, requiring him to prove that his refusal to give his consent was not unreasonable.

Plaintiff argues that he did not unreasonably withhold his consent to the assignment, but merely requested reasonable assurances from Mr. Issa that the lease would be guaranteed for its duration. Plaintiff focuses on Green Valley's debt-to-equity ratio and argues that Mr. Issa actually had only $1,000 in true equity in this concern. His debts, on the other hand, included a $200,000 SBA loan and $49,000 in proceeds from a second loan. Plaintiff now construes his lease as an extension of $180,000 of credit. He argues that Green Valley was a start-up corporation with no credit history and that the SBA required certain conditions from Green Valley and Mr. Issa before it would commit to a loan of $200,000. Finally, he observes that the transaction between Family Pride and Green Valley was a cash transaction, inferring that Family

Pride itself did not consider Green Valley credit worthy.

From this he maintains he would have been justified in simply rejecting the proposal outright; but he continued to negotiate, merely asking for a personal guarantee so that he could protect his own financial interest. While admitting that his lease with Family Pride required no personal guarantee from its stockholders, plaintiff argues that the financial condition of Green Valley was such that it had "one tenth the equity and ten times the debt of Family Pride and an owner with *no* experience in grocery store management." He urges our court to recognize that the requiring of personal guarantees is a reasonable business practice when a lessor is confronted with a prospective tenant who is a financial risk. (See *Kahili, Inc. v. Yamamoto* (1973), 54 Hawaii 267, 273, 506 P.2d 9, 12.) Finally, plaintiff points to the Restatement (Second) of Property, Landlord and Tenant, for an illustration which, he claims, supports his position:

> "L leases commercial property to T, the Lease requiring L's consent to any assignment or any sublease. L wanted T personally as a tenant because he thought T's presence on the leased property would improve the commercial tone of the area and L owned the commercial property nearby. L gave T quite favorable terms to induce T to locate his business on the leased property. T requests L's permission to assign the lease to T1, who is also a successful businessman. It may be found that L's refusal to consent under the circumstances is reasonable." 2 Restatement (Second) of Property, Landlord and Tenant sec. 15.2, comment g, illustration 7, at 105 (1977).

Defendant responds that he presented a commercially reasonable tenant to Mr. Vranas. The record discloses that Vranas was aware of the proposed assignment to Green Valley in October 1983, yet he did not raise these objections until January 17, 1984, immediately prior to the scheduled closing. Defendant argues that on December 5, 1983, Mr. Vranas received and evaluated all of the available financial and background information on Green Valley and its principal, Mr. Issa. This information included Green Valley's approved application for the SBA loan and Mr. Issa's financial statements. Defendant asserts that Mr. Vranas had even acknowledged his consent to the assignment in writing on December 7, 1983, contingent only upon Mr. Issa's giving Vranas the security assignment on the fixtures and equipment. Green Valley agreed to this security requirement, and it renegotiated its collateral security agreement with the SBA.

■ The law in Illinois is that where a lease forbids any sublease or assignment without the consent of the lessor, the lessor cannot unrea-

sonably withhold his consent to a sublease. (*Jack Frost Sales, Inc. v. Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 933, 944; see also *Losurdo Brothers v. Arkin Distributing Co.* (1984), 125 Ill. App. 3d 267; *Reqet v. Dempsey-Tegler & Co.* (1966), 70 Ill. App. 2d 32; *Scheinfeld v. Muntz TV, Inc.* (1966), 67 Ill. App. 2d 8, *appeal denied* (1966), 33 Ill. 2d 628.) A condition precedent to the lessor's duty to accept a sublessee is the tender to him of a suitable tenant. (*Jack Frost Sales, Inc. v. Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 933, 944; *Scheinfeld v. Muntz TV, Inc.* (1966), 67 Ill. App. 2d 8, *appeal denied* (1966), 33 Ill. 2d 628.) The issue on appeal is whether the proposed subtenancy met commercially reasonable standards. Such standards may include the financial responsibility of the proposed subtenant as well as the type of business to be conducted on the premises and whether the business competes with that of the lessor or any other lessee. (*Losurdo Brothers v. Arkin Distributing Co.* (1984), 125 Ill. App. 3d 267, 272.) Where the proposed transferee is insolvent, or of dubious financial responsibility, or has a poor payment record, the landlord's refusal to consent will not be found to be unreasonable. (*Jack Frost Sales, Inc. v. Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 933, 946.) The lessor is justified in refusing his consent until satisfactory proof of financial ability and responsibility is shown, regardless of what might later be shown in court. 104 Ill. App. 3d 933, 947.

In *Jack Frost Sales, Inc.*, a tenant brought suit to recover damages after his landlord had refused to consent to the assignment of the lease on a bar. The court held: "[B]efore the defendants could possibly be held liable for failure to consent to a transfer of the lease, the plaintiff had the burden of proving [citation], that it had tendered a person who was 'ready, willing and able' to take over the lease and who, at the very least, met reasonable commercial standards." (*Jack Frost Sales, Inc. v. Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 933, 944.) The court determined that the preponderance of the evidence was that the plaintiff did not produce anyone who was ready, willing and able to take over the lease on the relevant date. The court searched the record and determined that the only viable tenant was a start-up corporation which claimed to have stated capital of $1,000 (of which there was no evidence that the corporation had any cash at all). (104 Ill. App. 3d 933, 947.) The court observed that while one of the shareholders was wealthy, she was under no legal obligation to put any particular amount into the corporation. (104 Ill. App. 3d 933, 947.) Finally, the court noted that the evidence disclosed that the landlord was given no information establishing the corporation's financial responsi-

bility. 104 Ill. App. 3d 933, 947.

In *Reqet v. Dempsey-Tegler & Co.* (1966), 70 Ill. App. 2d 32, the court noted that defendant offered no evidence of the subtenant's suitability except a $400 deposit on the proposed sublease and the assurance that it would remain liable for the rest. (70 Ill. App. 2d 32, 37.) The court noted that this was insufficient to refute evidence tendered of the subtenant's unsatisfactory credit record and the dissimilar, and possibly speculative, use that the subtenant had proposed to make the premises.

Here, the corporation which was proposed as assignee was financially responsible. The corporation was incorporated with $25,000 in cash and an approved SBA-guaranteed $200,000 loan. Mr. Issa had also already tendered $5,000 as a security deposit; he had given the landlord the security assignment of all fixtures and inventory; and he had presented the landlord with his own personal finance statement and copies of the SBA loan agreement. The type of business to be conducted by Green Valley was identical in nature to that of Family Pride. The record supports the conclusion that Green Valley would be a responsible tenant. This case is distinguishable from *Jack Frost Sales, Inc.* and *Reqet v. Dempsey-Tegler & Co.* in that the trial court had before it considerable evidence that the corporation which was proposed was financially responsible and no evidence that it was financially irresponsible. It is also distinguishable from the Restatement (Second) of Property illustration as there is no evidence to the effect that Vranas originally induced Family Pride to the leased property; that Vranas gave Family Pride very favorable terms in order to have Family Pride locate its business there; or that Family Pride's presence was an improvement in the commercial tone of the area.

■ A careful examination of the record reveals that the trial court did not improperly shift the burden to the lessor or apply any improper legal standard in assessing the reasonableness of plaintiff's refusal to consent to the assignment. In light of the foregoing, we find that Family Pride had presented to the landlord a commercially suitable tenant.

The second party of plaintiff's argument is that there was no evidence that Green Valley would have been able to consummate its agreement with Family Pride. Plaintiff therefore contends it was, in effect, not tendered a party who was "ready, willing and able" to take over the lease. (See *Jack Frost Sales, Inc. v. Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 933.) A bank officer testified that his bank could not have loaned the equity funds to Green Valley as long as it was also providing the SBA financing. Green Valley's attorney testified that the additional funds had not been raised as late as February

7, 1984, two weeks after the deal was supposed to have closed. But, neither the SBA nor the Joliet National Bank objected to the $50,000 equity requirement being met by a loan from another institution. Mr. Issa had already put $25,000 into the corporation, and, while he did not have the other $25,000 at the time of the negotiations, there was no evidence that it would not have been available to him by the closing.

■ A prospective purchaser of real estate is deemed ready, willing and able to purchase if he has agreed to buy property and has sufficient funds on hand or if he is able to command necessary funds with which to complete purchase within the time set by offer. (See *e.g., Telander v. Posejpal* (1981), 94 Ill. App. 3d 616, 625.) Mr. Issa's ability to generate the capital is shown by a transaction in the fall of 1984 when a similar SBA-guaranteed loan of $160,000 was borrowed from the Union National Bank and $40,000 was injected into that corporation at the time of the disbursement by Mr. Issa. The trial judge did not err when he found Green Valley was ready, willing and able to take over the lease.

■ Plaintiff next argues that inconsistent and erroneous evidentiary rulings prejudiced the outcome of this case. He raises three specific instances of improper rulings. He first complains that the trial court improperly excluded evidence of negotiations that took place after January 17, 1984. These were the negotiations by which his counsel wished to show plaintiff's reasonableness (in continuing to negotiate with defendant). The trial judge based his exclusionary ruling on the fact that everything that occurred after the assignment had been rejected was irrelevant.

Evidence is relevant if it tends to prove a fact in controversy or renders a matter in issue more or less probable. (*Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473.) The continued negotiations were not relevant to the issues in this case. It was not error to exclude testimony which, in the judgment of the trial court, did not reasonably bear upon a specific issue under consideration. *Eleopolos v. Dzakovich* (1981), 94 Ill. App. 3d 595, 600.

■ Plaintiff's second complaint concerns the admission of evidence concerning a transaction by Mr. Issa in October 1984. That testimony concerned Mr. Issa's subsequent successful purchase of another business with the assistance of an SBA loan.

We find that that evidence was not offered to prove that Green Valley would be a commercially reasonable tenant but was tendered in response to plaintiff's contention that Mr. Issa would not have been able to close on the Family Pride deal due to lack of sufficient funds. This assertion goes to the other element of the proper tender of a sub-

tenant: his "ready, willing and able" status. As noted above, the phrase "ready, willing and able" does not necessarily mean having the funds immediately available, but can include the concept of being able to marshall such funds. (*Telander v. Posejpal* (1981), 94 Ill. App. 3d 616, 624-25.) This transaction did demonstrate Mr. Issa's ability to marshall funds. The trial court's admission of this evidence for the purpose of rebutting plaintiff's accusation that Mr. Issa was not able to marshall $25,000 was not improper.

■ Plaintiff's third complaint is that the trial court admitted the *pro forma* balance sheet and income statement for Green Valley, prepared by the bank's loan department. The document stated, *inter alia,* that the

> "*pro forma* debt to net worth ratio is 4:1. *** [F]or a start-up situation in the food store business this amount of investment does seem to be adequate. The current total assets of $205,000 compares to current liabilities of $21,000 is a very satisfactory 10:1 current ratio. Since the business is an all cash business, we feel the ratios are strong and very credit worthy ***."

Plaintiff objects that the document is both hearsay and irrelevant because the inquiry on appeal is "regardless of what might later be shown in [the] court." (*Jack Frost Sales, Inc. v. Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 933, 947.) This document was never presented to the landlord at the time of the assignment negotiations.

Defendant argues that the document was not admitted to prove the truth of the matter asserted in the document, but rather to show the extent of the background investigation undertaken by the bank.

The trial court's admission of this document was erroneous, but since there never was an issue in the case concerning the conduct of the bank in approving the SBA-guaranteed loan, we find no prejudice. In nonjury cases, it is assumed that the trial judge in reaching the decision disregarded improperly admitted evidence, if the record contains sufficient competent evidence to sustain the result. (*Knight v. Collings* (1907), 227 Ill. 348, 353; see also *Owen v. Pret' A Porter Boutique, Inc.* (1973), 15 Ill. App. 3d 438, 443.) We therefore find that none of plaintiff's contentions concerning the trial court's decision on evidence merits a reversal of the outcome of this case.

■ Finally, plaintiff contends that even if the trial court had properly decided that he had unreasonably withheld his consent to the proposed assignment, Family Pride would still not be entitled to recover lost profits. He cites *Spangler v. Holthusen* (1978), 61 Ill. App. 3d 74, for the proposition that the recovery of lost profits may be allowed as an element of damages for breach of contract only where both parties,

at the time of the making of the contract, contemplated that such profits would be lost if the contract were breached. (61 Ill. App. 3d 74, 80.) Plaintiff points to the admission of Mr. Laub that Family Pride had not even contemplated this transaction when they originally signed the lease. Under these circumstances, plaintiff argues that no award of lost profits can be sustained as a matter of law. See *Globe Refining Co. v. Landa Cotton Oil Co.* (1903), 190 U.S. 540, 47 L. Ed. 1171, 23 S. Ct. 754; *Rivenbark v. Finis P. Ernest, Inc.* (1976), 37 Ill. App. 3d 536; *Hadley v. Baxendale* (1854), 156 Eng. Rep. 145, 9 Exch. 341. See generally 15 Ill. L. & Prac. *Damages* sec. 33 (1968).

We disagree. Family Pride's complaint was based on Villa Park Plaza Associates' breach of their lease contract. There are three principles to apply in determining whether lost profits will be allowed as compensation in contract cases:

> "Lost profits will be allowed only if (1) their loss is proved with a reasonable degree of certainty [citations]; (2) the court is satisfied that the wrongful act of the defendant caused the loss of profits [citation]; and (3) the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered into [citation]." (*Rivenbark v. Finis P. Ernest, Inc.* (1976), 37 Ill. App. 3d 536, 538-39.)

Plaintiff focuses on the third principle of *Rivenbark.* This is elaborated more fully in *Sitnick v. Glazer* (1956), 11 Ill. App. 2d 462, 467-68, where the court, quoting from 25 C.J.S., *Damages*, section 24 (1966), discussed the general standard for damages:

> " 'As a general rule . . . the damages to which one party to a contract is entitled because of a breach thereof by the other are such as arise naturally from the breach itself, or such as may reasonably be supposed to have been within the contemplation of the parties at the time of making the contract as a probable result of a breach thereof . . . .
>
> 'In the application of the rule it is held that the parties will be presumed to have contemplated that the party injured by the breach of the contract would sustain such damages as would fairly and substantially, in the usual course of things, result from such breach, in the light of all the facts known or which should have been known to them . . . .
>
> '. . . It is not required that the parties shall have considered the consequences at the time of making the contract, but the consequences must be such as the parties may fairly be supposed to have considered, or at least would have considered as flowing from a breach of the contract if they had then been in-

formed of all of the facts.' "

In the instant case, Vranas focuses on the fact that neither party knew, at the execution of their lease, that Family Pride would be sold to Green Valley. This focus is misplaced. We focus, not on the specific transaction with Green Valley, but on whether the parties to the original lease contemplated that Family Pride might be sold. The lease contains two clauses which look to the possibility of a sale of Family Pride. Section 6.02 of the lease provides that "if at any time during the term of the Lease, any part or all of the corporate shares shall be transferred by sale, assignment, or other disposition so as to result in a change in the present ownership of said corporation, Landlord may serve notice upon Tenant, electing to treat such transfer of corporate shares as a violation of the terms of this Lease * * *." Section 6.03 provides that "Tenant represents to Landlord that at the commencement of this Lease the ownership of Capital Stock in Tenant shall be in the name and percentage as follows: Barry Laub 50% Charles Marthaler 50%."

■ We conclude that the parties understood that Family Pride could have been sold at some time in the future, and that if Vranas unreasonably withheld his consent to the assignment, Family Pride could suffer damages in the form of lost profits. This distinguishes the instant case from *Spangler v. Holthusen* (1978), 61 Ill. App. 3d 74, where the court denied the award of lost profits because the third-party transaction between Holthusen and a third party was unknown to the seller, Spangler. (61 Ill. App. 3d 74, 80-82.) Plaintiff's contention that defendant should be barred from recovering lost profits is incorrect as a matter of law.

In conclusion, we find that (1) defendant presented plaintiff with a commercially reasonable tenant who was ready, willing and able to assume the existing lease and that plaintiff's failure to consent to the assignment was unreasonable; (2) the trial court made no erroneous rulings as to admitted evidence which prejudiced the outcome of this case; and (3) defendant is entitled to lost profits which are attributable to plaintiff's wrongful conduct.

Affirmed.

NASH, P.J., and SCHNAKE, J., concur.