In the

# United States Court of Appeals
### For the Seventh Circuit

---

No. 01-3449

LINC EQUIPMENT SERVICES, INC.,

*Plaintiff-Appellant,*

v.

SIGNAL MEDICAL SERVICES, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 97 C 8049—**David H. Coar**, *Judge.*

---

ARGUED DECEMBER 3, 2002—DECIDED FEBRUARY 5, 2003

---

Before EASTERBROOK, MANION, and EVANS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Signal Medical leased from Linc Equipment a mobile magnetic resonance imager (MRI), an expensive device that had a monthly net rental in the $30,000 range. (The "net" signifies that Signal covered expenses, including insurance and taxes, on top of the $30,000.) Signal promised to return the MRI at the end of the lease in good condition, less normal wear and tear. Signal, which like Linc is a merchant in the business of renting medical equipment, subleased this MRI to a hospital, which later returned the machine directly to Linc. Unfortunately, the MRI was left on during transit,

which damaged the magnet and required the machine to be taken out of service for 10 months while it was repaired. The repairs, which cost about $130,000, were paid for by the insurance carrier. Linc sued in state court both Signal and the firm that handled the machine's transportation; the insurer intervened to make a third-party claim in subrogation against Signal. This suit was removed to federal court under the Carmack Amendment, 49 U.S.C. §14706, applicable because of the interstate transportation. Signal, the insurer, and the carrier resolved their differences, leaving only Linc's claim against Signal for 10 months' lost rental value. Because the damage to the MRI likely occurred during transit, the state-law claims are sufficiently related to the federal-law theory that they come within the supplemental jurisdiction. See 28 U.S.C. §1367(a); *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.*, 77 F.3d 928, 932-33 (7th Cir. 1996).

After the parties agreed to a bench trial, the district judge tackled damages ahead of the merits. The judge assumed that Signal is responsible for any harm to the MRI and held a hearing to explore the question whether it is liable for consequential damages (repair costs already having been resolved). As the judge understood Illinois law, which the parties agree governs, consequential damages may be awarded only if the signatories "expressly contemplated" them. The contract does not in so many words entitle Linc to consequential damages, and at the evidentiary hearing the persons who negotiated the lease testified that they had not discussed or thought about this subject. As a result, the judge concluded, consequential damages could not have been "expressly contemplated." This finding led to judgment on the merits in Signal's favor.

We doubt that Illinois requires "express contemplation" of consequential damages—or that, if it does, this phrase implies a subjective as opposed to an objective inquiry. Although the district judge and the parties did not mention

it, *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854), remains the dominant source of law on the recovery of consequential damages for breach of contract, and we have held that Illinois follows *Hadley*'s approach. See, e.g., *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1368-69 (7th Cir. 1985); *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 955-59 (7th Cir. 1982). What *Hadley* holds is that a consequential loss is compensable only if "reasonably foreseeable," not that it must be "expressly contemplated." Although the phrase "expressly contemplated" crops up in some Illinois cases, that state's judiciary has explained that it is used as a synonym for foreseeability. See, e.g., *Vranas & Associates, Inc. v. Family Pride Finer Foods, Inc.*, 147 Ill. App. 3d 995, 1007, 498 N.E.2d 333, 342 (2d Dist. 1986). Signal, which like Linc was a merchant in the medical-equipment-rental business, reasonably could have foreseen that return of the MRI in bad condition would cost Linc rental revenue while it was being repaired. That the lease excluded consequential damages in an action by Signal, but not in an action by Linc, shows that the parties must have understood this possibility. We do not see in Article 2A of the Uniform Commercial Code, which covers equipment leases, any provision negating *Hadley*'s application. Although §530, enacted in Illinois as 810 ILCS §5/2A-530, permits lessors to recover "incidental damages" without mentioning "consequential damages", this does not imply that consequential damages are *forbidden*; §532 (810 ILCS §5/2A-532) preserves other remedies.

What is more, it is hard to see why income lost because of inability to rent a chattel should be classified as "consequential" damages at all. Lost rental value is a direct outcome of the broken promise and does not depend on the details of Linc's business or any idiosyncratic way that Linc would employ the MRI—things that Signal might not know and therefore could not consider when deciding how much care to take with Linc's machine. To see this, sup-

pose that Linc wanted to sell rather than rent the MRI immediately after its return from Signal's customer. The selling price of a MRI depends on expected net income (rental or billings to patients, less costs), plus scrap value at the end of its economically useful life, all discounted to present value. Suppose that this MRI in good condition would have had 60 months of service remaining before becoming obsolete. The same machine, with the damage actually sustained, would have had only 50 months' service remaining (deferred for 10 months) and required a $130,000 capital investment to repair. It therefore would have sold for less than the same machine in operable condition. The difference between what the MRI would have fetched in a sale immediately after its return in damaged condition, and what it could have been sold for had Signal kept its promise to return it in good condition, is the real economic loss caused by transporting the machine with the magnet on. It fits nicely within standard measures of damages in contract cases. See generally E. Allan Farnsworth, III *Farnsworth on Contracts* §12.9 (2d ed. 1990).

Because the market price of rental equipment capitalizes the expected rental stream—not only reducing cash flows to present value but also taking into account the probability that some months will not fetch rentals, when machines are between customers or demand is slack—it would be double counting to award a lessor anything extra for lost rental income. Consider what should happen if one of Hertz's customers has an accident and the car must be taken out of the fleet for a month while being repaired. Would Hertz recover not only the cost of repair (say, $1,000) but also the $50 daily rental during that month ($50 × 30 = $1,500)? Such a measure frequently would overcompensate the lessor. If the accident caused the value of the used car to decline by, say, $1,500 (from $15,000 in good condition to $13,500 with

repairs pending), Hertz could sell the damaged car for $13,500, invest an extra $1,500, buy a used car equal in value to the one it expected to receive at the end of the rental, and rent *that* car for $50 per day. Its full loss would be $1,500 (the difference in resale prices); if Hertz neglected to cover in the market, and instead claimed a loss of $2,500, it would be met with the defense that it had failed to mitigate damages. Just so with Linc. If it had a ready market for MRI machines, it could have covered when it learned of the problem and leased out the newly purchased machine; then its full loss would have been the difference between the cost of cover and the amount it could have realized when selling the damaged machine.

One must consider as well the possibility that MRI machines have lives that depend on accumulated use (wear and tear) rather than technological obsolescence. In that event, taking the machine out of service did not cost Linc ten months' rental but only postponed its receipt. Then damages would be limited to the time value of money (that is, to interest on the deferral of income). The magnet's rebuilding might even have extended the machine's useful life. All of this is captured automatically in the difference between the sale prices of sound and damaged MRI devices, which makes this calculation preferable to judicial attempts to determine how likely it was that a particular machine would have been rented during these particular months, what its expected useful life may have been, and so on. Best to take advantage of market prices that reflect this information, rather than try to generate the information on the witness stand. We know that this MRI *was* sold for $475,000 immediately after the repairs were completed; such a price for a fully functional MRI, with many future months of rental in store, strongly implies that $300,000 would be an excessive award for the loss of 10 months' use.

So the district court was right to conclude that Linc is not entitled to damages measured by the monthly rental times the number of months required for repair, but wrong to think that the cost of making repairs sets a cap on damages. The judgment is vacated, and the case is remanded for further proceedings consistent with this opinion.

A true Copy:

    Teste:


_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*